Michael B. Carlinsky (*pro hac vice admission forthcoming*)
Rachel E. Epstein (*pro hac vice admission forthcoming*)
Stephen Q. Wood (12403)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone: (801) 515-7300
Facsimile: (801) 515-7400
michaelcarlinsky@quinnemanuel.com
rachelepstein@quinnemanuel.com
stephenwood@quinnemanuel.com
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VIVINT, INC., a Utah corporation; VIVINT SMART HOME, INC., a Delaware corporation; SMART HOME PROS, INC., a Utah corporation<br><br>        Plaintiffs,<br><br>v.<br><br>SUNRUN, INC., a Delaware corporation; BRADLEY ROSSITER, an individual; ZACKARY ANDERSEN, an individual; NATHAN LORDS, an individual; JAYCEN SHAW, an individual,<br><br>        Defendants. | **COMPLAINT**<br><br>Civil No.<br><br>Judge |

### *NATURE OF THE ACTION*

1.      This is an action to stop an immediate and ongoing raid by a competitor company to steal employees, customers, and confidential trade secret information. Plaintiffs (together "Vivint") are Utah-based companies. They bring this action to halt a brazen conspiracy, coordinated by Vivint's competitor, Defendant Sunrun, aided by the Individual Defendants, who are recent former Vivint employees, to unlawfully poach Vivint's lifeblood—its talented

salespeople—and raid Vivint's confidential customer and other business information along with them. This raid is continuing. Indeed, over the past weekend, multiple additional Vivint employees posted on social media that they were violating their non-compete agreements and moving to Sunrun; many of these same employees were simultaneously logging into Vivint's systems, accessing Vivint's confidential information, and as of this filing have yet to even notify Vivint of their resignations. Intervention from this Court is urgently needed to stop Sunrun's efforts.

2.     Vivint and Sunrun compete throughout the country in direct-to-home sales of solar panel systems for residential customers. For months, Sunrun has worked covertly to entice top Vivint employees to break their contracts with Vivint and join Sunrun. Sunrun is well aware that the Vivint employees whom it is poaching have enforceable restrictive covenants, including non-compete and solicitation restrictions, but has nonetheless continued to act with impunity. In fact, Sunrun was created, in part, through the acquisition of a stand-alone former solar division of Vivint, and as a result, many of the senior executives at Sunrun are former Vivint senior employees, who are well aware of Vivint's systems and contracts.

3.     Over the course of the last several days, it has become clear that Sunrun is making a concerted blitz effort not only to poach key Vivint senior employees, but also to entice them to solicit their entire downline teams, in an effort to steal Vivint's customers, usurp Vivint's confidential trade secrets, and simultaneously gut Vivint's ability to compete, all while Sunrun and the named individual Defendants know that Vivint's ability to respond quickly would be hampered by the Federal holiday.

4.     Unbeknownst to Vivint, Sunrun began to plant the seeds for its raid on Vivint last year. On or about December 20, 2023, Defendant Jaycen Shaw, then a top Vivint employee,

informed Vivint of his intention to leave for competitor Sunrun.  Shaw was very well paid during his time at Vivint, supervised dozens of employees, and had access to some of Vivint's most competitively sensitive customer and other business information.  During his employment with Vivint, Shaw signed numerous employment and equity grant agreements containing enforceable restrictive covenants.  Unbeknownst to Vivint, Shaw's abrupt departure was merely the start of the unfolding of Sunrun's and Shaw's long-standing plot to poach dozens, if not hundreds, of Vivint employees and to steal Vivint's confidential information.  Indeed, as detailed below, it now appears that Shaw and Sunrun have been working together since no later than June 2023 to put into place this raid.

5.     Phase two of Sunrun's raid on Vivint began last week.  On Tuesday, January 9, 2024, Defendant Bradley Rossiter, a highly compensated fourteen-year Vivint employee, tendered his resignation and told Vivint he intended to go to work for Sunrun.  Rossiter supervised over 200 Vivint sales employees, and, like Shaw, Rossiter had employment and equity grant agreements with Vivint containing enforceable restrictive covenants.  During the meeting in which Rossiter resigned, he acknowledged the support Vivint had given him throughout the years, as well as his post-employment obligations not to solicit Vivint employees or customers or otherwise unfairly compete with Vivint, and assured Vivint he was committed to departing "the right way."  This was important to Vivint, as, by dint of his position, Rossiter had access to significant employee and customer relationships, as well as access to confidential trade secret information, including information about Vivint's customers and real-time information identifying Vivint's top producing sales people.  Although Vivint was concerned to be losing both Shaw and Rossiter, it did not immediately draw a conclusion that Rossiter's departure was tied to Shaw.

6.      The next day, Wednesday, January 10, 2024, two of Rossiter's direct reports—Defendants Zackary Andersen and Nathan Lords—also tendered their resignations.  Andersen managed a team of over 100 Vivint Smart Home sales people.  Lords also managed a team of Vivint solar sales people.  Both were highly compensated by Vivint, were subject to enforceable restrictive covenants, including non-solicits and non-competes, and had access to similar confidential trade secret information to Rossiter.

7.      Since the abrupt departures of Rossiter and two of his senior team members, Vivint has already discovered a number of salient facts about the circumstances of their departures, revealing their and Sunrun's role in orchestrating the illegal raid on Vivint.

8.      *First*, social media posts made over the weekend of January 12-15, 2024, by various other Vivint employees who report up to Defendants Rossiter, Andersen, and Lords make clear that Sunrun, with the assistance of the Individual Defendants, has already successfully recruited additional Vivint employees to leave for Sunrun, and that the solicitation efforts are active and ongoing.  These posts refer to the "transfer portal" from Vivint to Sunrun being open—as if the individuals were NCAA athletes, not employees with duties to their employer—and specifically reference that at least two entire teams that reported directly to Rossiter, Andersen's and/or Lords's, have "joined the transfer portal" and are moving to Sunrun.  These posts also contain pictures of these teams of current Vivint employees wearing Sunrun gear.  Notably, none of these other Vivint employees has given notice of their resignations to Vivint, and thus until Vivint discovered this social media activity, they continued to have access to numerous of Vivint's secure data systems housing some of its most sensitive and confidential information.  Many of these other employees have tried to access Vivint systems as recently as this past weekend, *after* broadcasting that they are leaving Vivint on social media but without notifying Vivint.

9.     *Second*, it has become clear that the individual Defendants have been plotting their departures for some time.  It has also become clear that the individual Defendants are each aware of their restrictive covenant obligations to Vivint.  For example, atypically and within days or weeks of their leaving, they each asked Vivint human resources for their individual contracts containing their restrictive covenants, and facilitated providing those in their respective teams with copies of these as well.  Defendant Rossiter also slow-played signing his latest annual agreement with Vivint until his departure last week, despite communications with human resources about the need to sign—historically Rossiter signed his annual agreements no later than early December.  It is clear from these actions that this was a coordinated and well-planned effort.  Throughout this entire time, and up through the days of their resignations, the individual Defendants have nonetheless continued to access the various Vivint data systems.

10.     *Third*, it has become clear that the departures of Rossiter, Andersen, Lords, and their teams are part of a larger, long-planned scheme hatched by Sunrun in coordination with Defendant Shaw.  In fact, Vivint has uncovered that Shaw took multiple active steps, while still a top Vivint employee, to aid Sunrun's poaching and to actively solicit Vivint employees for Sunrun. For example, Vivint has now learned that as far back as summer of 2023, Shaw (who was then a Vivint employee) took advantage of a retreat in St. George, Utah to actively recruit Vivint employees to Sunrun.  Even more egregious, shortly before his departure, Shaw had his Vivint sales team fly to California, ostensibly on a Vivint work trip, only for the Vivint employees to find that it was actually a recruiting junket for Sunrun.  And, since his departure, Shaw—whom Sunrun apparently encouraged to move to California in an effort to evade Utah's jurisdiction—has been continuing to actively solicit Sunrun employees.

11.    *Fourth*, on information and belief, Sunrun has, over this past holiday weekend and the preceding few weekdays, been holding large social recruiting events for current and/or transferring Vivint employees at Sunrun's Lehi, Utah facility, apparently linked to the raid.

12.    Plaintiffs bring this action seeking injunctive relief to stop the Sunrun raid and to protect their trade secrets, and to recover damages to compensate for injuries they have already suffered.

***THE PARTIES***

13.    Plaintiff Vivint, Inc. is a Utah corporation with its principal place of business 4931 North 300 West, Provo, Utah 84604.

14.    Plaintiff Vivint Smart Home, Inc. is a Delaware corporation, and its principal place of business is 4931 North 300 West, Provo, Utah 84604.

15.    Plaintiff Smart Home Pros, Inc. ("SHP") is a Utah corporation, and its principal place of business is 4931 North 300 West, Provo, Utah 84604.  SHP is an affiliate of Vivint, Inc. and Vivint Smart Home, Inc.

16.    Defendant Sunrun, Inc. ("Sunrun") is a Delaware corporation, and its principal place of business is in California.

17.    Defendant Bradley Rossiter is an individual who, upon information and belief, resides at 3941 S. 2820 E., Salt Lake City, Utah 84124.

18.    Defendant Zackary Andersen is an individual who, upon information and belief, resides at 743 S. Carterville Rd., Orem, Utah 84097.

19.    Defendant Nathan Lords is an individual who, upon information and belief, resides at 2912 Oakhurst Drive, Salt Lake City, Utah 84108.

20.     Defendant Jaycen Kent Shaw is an individual who, upon information and belief, resides in California.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the Federal Defend Trade Secrets Act claim arises under the laws of the United States.

22.     Personal jurisdiction is proper because Defendant Sunrun maintains a place of business in Utah; Defendant Rossiter, Andersen, and Lords reside in Utah; and the unlawful acts giving rise to the causes of action at issue, including the unlawful acts committed by Defendant Shaw, occurred in Utah.

23.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the causes of action at issue occurred in this district.

## FACTUAL BACKGROUND

### Vivint and Sunrun's Business

24.     Established in 1999, Vivint is a leading smart home platform company that serves roughly 2.0 million subscribers across the United States.  Vivint offers its customers a range of Vivint "Smart Home" products and services, such as smart cameras, locks, lights, thermostats, garage door control, systems to track energy use and efficiency, and a host of safety and security sensors.  Vivint's focus is on providing its customers with an integrated smart home platform and operating system that optimizes operations across a customers' discrete devices.

25.     Vivint's offerings also include a variety of residential solar-energy products and services, such as energy-generating photovoltaic panels, solar batteries to store that energy, and the technology needed to convert a customer's solar energy into usable power.  In 2011, Vivint spun off the installation and financing arm of its solar-energy segment into Vivint Solar, Inc.

("Vivint Solar").  Vivint Solar was first established as an independent entity and business affiliate of Vivint, before subsequently being spun off to private equity investors.

26.     In 2020, Sunrun acquired Vivint Solar, merging it into Sunrun's solar sales and marketing operation.  At the time of Sunrun's acquisition of Vivint Solar, Vivint Solar was one of the leading sellers of solar panels on home rooftops in the United States.  Moreover, due to its corporate history as a former Vivint affiliate, Vivint Solar's leadership included (and still does include) a number of former senior Vivint employees, who, by virtue of the acquisition, assumed leadership positions at Sunrun.  As just one example, Paul Dickson—Sunrun's current Chief Revenue Officer—was formerly Vivint's Director of Smart Grid and Energy Management before becoming Vivint Solar's Chief Revenue Officer.  From the time of its inception in 2011 through December 2019, Vivint Solar had installed solar energy systems in approximately 188,330 homes across the country.

27.     Notwithstanding the divestiture of Vivint Solar, Vivint has continued to and still does operate a business marketing and selling solar-energy products and services.  Sunrun's and Vivint's solar businesses directly compete with one another. Each markets and sells residential solar, battery storage and energy services throughout the United States, including in the same regional markets, and caters to the same customer base.

28.     Each company's solar sales operation includes substantial door-to-door sales.  In the door-to-door sales business, being able to effectively identify customers who are more likely to purchase a product provides a substantial competitive advantage.  As described further below, Vivint has devoted considerable time and resources to developing tools, techniques, and databases aimed at identifying prospective customers who are most likely to purchase its products, giving it an edge over its competitors, such as Sunrun.

29.     While each party's solar sales operations target overlapping regions and customers and focus on door-to-door sales techniques, the two companies have different underlying business models.  Vivint's business model involves selling home solar systems to its customers and then partnering with other companies to provide installation and financing services for those systems. In contrast, Sunrun markets and provides both the underlying solar systems as well as the installation and financing related to those systems.

30.     This difference in business model means that Sunrun's solar business incurs significantly larger fixed costs than Vivint's, due to the costs associated with handling its customer's installation and financing.  On information and belief, the fixed costs associated with this integrated sales model have become increasingly more difficult for Sunrun to bear in recent years, making it harder for Sunrun to maintain profits while still competing with companies that are unhampered by such fixed costs—like Vivint.  Rather than look towards legitimate business methods to reduce these costs, Sunrun has apparently decided to chase its profits and customer numbers by improperly raiding the sales talent of its competitors, including Vivint, as described herein.

31.     Indeed, Vivint is not the first victim of Sunrun's corporate raiding playbook.  In May 2021, another major seller and installer of residential solar systems, Trinity Solar Inc. ("Trinity"), filed a lawsuit against Sunrun in New Jersey Superior Court, alleging that Sunrun engaged in a scheme to pirate Trinity's high-ranking sales employees, customers, and business, including by tortiously assisting and funding those employees' breaches of their duties to and covenants with Trinity.  Sunrun responded by counter-suing Trinity in California Superior Court, seeking to invalidate the Trinity employees' restrictive covenants.

**Defendant Bradley Rossiter**

32.     Rossiter began employment with Vivint in or around 2010.  He started at Vivint as a sales representative.  Up until his abrupt resignation from Vivint on January 9, 2024, Rossiter was a Regional Manager at Vivint.  At the time of his resignation, Rossiter was at the highest level of Vivint's sales organization, and he managed a regional team (also called a "downline") of over 200 sales representatives, including six regional managers as his direct reports.  Rossiter's region was among the top performing sales units at Vivint in 2022, with over 8,800 smart home accounts and solar accounts representing 11.5 megawatts of solar production.  Rossiter had similar top performance in 2023.  Rossiter, like the other Individual Defendants, was highly compensated at Vivint.

33.     Rossiter earned compensation at Vivint through commissions for sales, including sales made downstream in his sales organization.  He also received residuals for past sales, and was a participant in the Omnibus Incentive Plan of Vivint Smart Home, Inc., a Vivint affiliate.  Through the Incentive Plan, Rossiter received grants of unvested equity in Vivint.

**Defendant Zackary Andersen**

34.     Andersen began employment with Vivint in or around 2018 and has been a sales representative for six years.  At the time of Andersen's resignation, he was a Regional Manager at Vivint, based in Utah and working also in North Carolina and Arkansas.  Andersen led a team of over 100 lower level-managers and sales representatives.  At Vivint, Andersen led a team called "Meraki," which he described as "one of the top producing teams in the company."  Andersen and his Meraki team were part of Rossiter's "downline."

35.     Andersen resigned from Vivint by email to Vivint's leadership on January 10, 2024, at 1:35 p.m.

**Defendant Nathan Lords**

36.    Lords began employment with Vivint in or around 2019.  At the time of Lords' resignation he was a Manager at Vivint, based in Utah and working also in Arkansas, where he was the number one solar producer at the company.  Lords and his team were part of Rossiter's "downline."  Lords led a team of lower-level managers and sales representatives.

37.    On the same day Andersen resigned, January 10, 2024, Lords also resigned from Vivint.  Lords emailed his notice of resignation to Vivint's leadership team less than five hours after Andersen's email, at 6:30 p.m.

**Defendant Jaycen Shaw**

38.    At the time of Shaw's termination, he was a Regional Sales Manager at Vivint, had just moved from Utah to California and was still managing employees based primarily in Southern Utah.

39.    Shaw was terminated by Vivint on December 20, 2023, after disclosing his intention to move to Sunrun.

**The Individual Defendants Have Access To, and Use, Vivint's Trade Secrets and Confidential Information**

40.    In direct, door-to-door sale industries like the one in which Vivint and Sunrun are engaged, sales representatives' ability to target and focus their efforts on customers likely to buy is crucial to their success.  Rather than conducting door-to-door contacts at random, any information that can allow a sales representative to target those customers, or "leads," who are particularly likely to buy allows them to conduct their sales efforts much more efficiently, and at lower cost.

41.    As sales representatives and senior managers at Vivint, the Individual Defendants had access to a number of different tools, all developed by Vivint and at Vivint's expense, that

11

provided them with key confidential and proprietary information about potential customer leads for Vivint's products.  These tools and the confidential information they contain, in the hands of a competitor like Sunrun, would allow the competitor to gain a competitive advantage over Vivint by being able to target these particularly likely customers and thus make their sales organization much more efficient and successful.

42.     For example, the Individual Defendants each had access to Vivint's solar customer information managed through a platform called Enerflo.  In Enerflo, a Vivint sales representative would be able to view real-time customer information for their region, including customer names and contract information as well as sales notes and other intelligence on potential customers. Senior managers like Rossiter can see this detailed customer information for their entire downline.

43.     In addition, each Individual Defendant also had access to Amigo, a proprietary lead-setting tool developed and used at Vivint.  Using Amigo, Vivint's sales representatives selling smart home products can capture a "lead," meaning a customer who expressed an interest in adding solar, which would then be transferred into Enerflo, where a Vivint solar sales representative can use the lead for future sales efforts.  Sales representatives can see their own leads in Amigo, and senior managers like the Individual Defendants are able to see information for their entire downline.  These leads are highly valuable – they are the building blocks of a sales rep's likely sales targets.

44.     In addition, the Individual Defendants also each had access to additional trade secrets in the form of customer information, individual employee performance metrics, and training materials.  Each of which was protected by individual multi-factor authentication security measures, as well as confidentiality agreements with each of the Individual Defendants and with all individuals with such access.  This customer, employee, and organizational information has

been developed over many years at extensive cost, and its secrecy is essential to Vivint's competitiveness in the direct-sales marketing industry.

45.    For example, as Vivint employees, the Individual Defendants each had access to Street Genie, a proprietary system for managing customer information.  With Street Genie, a Vivint employee can access in real-time a map of Vivint customers, with geo-tagged information such as the customers' names, sales notes, and whether that customer is currently due for an upgrade.  The customer information to which the Individual Defendants have gained access is the product of years of Vivint employees' door-to-door sales efforts and is an invaluable resource for assessing the market saturation of a given area and for tracking likely repeat customers.  An example of the type of information that employees can access in Street Genie is below:



46.     As Vivint Sales Managers, the Individual Defendants also had manager-level access to Insider, Vivint's proprietary system for tracking sales performance at the level of the individual, team, and office.  Because Vivint's business model is based on the acquisition and retention of top salespeople, granular knowledge of sales performance is vital to Vivint's competitiveness as an employer, directly translating to its bottom-line sales.

47.     As Vivint Sales Managers, the Individual Defendants had access to Vivint's sales and other training resources, housed on its ConveYour platform. These resources, all developed in-house at Vivint's expense, include videos, manuals, and workshop materials describing sales techniques developed through years of effort and iterative improvement by Vivint employees—indeed, these materials explain that the techniques are developed from, for example, tens of thousands of home installations.  Vivint's reliance on entry-level salespeople is dependent upon Vivint's being able to develop reliable sales techniques that are digestible and replicable by new employees.  These training materials are sensitive and would be highly valuable in the hands of a competitor, especially one like Sunrun attempting to bring on a new large sales force.

48.     Beyond these systems, the Individual Defendants, in their capacity as both Vivint employees and Vivint Sales Managers, are exposed to confidential, trade secret information through their direct contact with Vivint customers.  Upon information and belief, the Individual Defendants have retained personal records of the names and contact information of Vivint customers with whom the Individual Defendants or members of their downstream teams have made prior sales.

49.     Recognizing its sensitivity, Vivint took multiple steps to protect the above information.  Each of these systems—Enerflo, Amigo, Street Genie, Insider, and ConveYour—is protected by multi-factor authentication.  Before gaining access, employees must not only provide

14

a unique password but confirm their identities via their mobile device. Only Vivint employees and otherwise authorized individuals, subject to confidentiality agreements, have access to Vivint's information in these systems. Moreover, Vivint also takes steps to keep information within the systems on a need-to-know basis. For example, Vivint's information contained in Enerflo is hierarchical, and Vivint restricts an individual sales representative's access to his or her own region.

50.     All Vivint employees are also subject to confidentiality agreements under their respective Employment Agreements. Moreover, each of the Individual Defendants is further subject to confidentiality agreements pursuant to their respective Restricted Stock Unit ("RSU") Agreements under which each was granted equity in Vivint. These RSU Agreements moreover contain intellectual property provisions that confirm that Vivint retains all ownership of and right to such information generated within the scope of the Individual Defendants' employment.

### The Individual Defendants Entered Into Agreements Containing Clear Restrictive Covenants

51.     As part of its efforts to protect its confidential and proprietary trade secrets and other information, Plaintiffs require employees, including the Individual Defendants, to execute a number of agreements in which they acknowledge and agree that they will not, among other things, solicit Vivint employees or Vivint customers, compete with Vivint if they leave, and/or disseminate or otherwise violate Vivint's confidentiality.

52.     First, each of the Individual Defendants entered into seasonal employment agreements with Plaintiff SHP. These agreements typically covered a sales season, running roughly from October to the next October.

53.     Defendant Andersen entered into the Sales Representative Employment Agreement for the 2023-24 Sales Season ("Employment Agreement") on October 2, 2023. (*See* Ex. 1.)

Defendant Lords entered into the Employment Agreement on September 1, 2023.  (*See* Ex. 2.)  Defendant Shaw entered into the Employment Agreement on September 28, 2023.  (*See* Ex. 3.)  Each Employment Agreement ran from the date each employee signed it.  (*See, e.g.*, *id.* ¶ 2.)  Each also executed Employment Agreements in the preceding seasons.

54.     Defendant Rossiter historically signed his annual Employment Agreements no later than December, including for the 2022-2023 season.  (*See* Ex. 4.)  However, it appears he did not sign a 2023-24 Sales Season Employment Agreement, but instead deliberately delayed his signature in anticipation of his resignation.  Indeed, in November 2023, Rossiter made specific inquiries about his 2023-2024 agreement, asking his Regional Coordinator to re-send him a copy and indicating an intent to sign.

55.     Apart from the dates on which they were signed by the Individual Defendants, each Employment Agreement is identical.

56.     The Employment Agreements are governed by Utah law.  (*See, e.g.*, Ex. 1 (Andersen), ¶ 21.

57.     Vivint, Inc. is expressly named as a third-party beneficiary in the Employment Agreements.  (*See, e.g.*, Ex. 1 (Andersen), ¶ 19; Ex. 4 (Rossiter) ¶ 19.)  The Employment Agreements provide that, "As such, Vivint is legally entitled to enforce this Agreement."  (*Id.*)

58.     Under the Employment Agreements, each Individual Defendant was responsible for, among other things, sales, "attempting to increase direct sales activities of other direct sellers working for SHP," "providing motivation and encouragement," and recruiting other sellers.  (*E.g.*, Ex. 1 (Andersen) ¶ 3.)  If an Individual Defendant recruited another to work for SHP, that person (if they became employed) would be on the Defendant's "team," (*id.*), and the Individual Defendants would then earn compensation based not only on their own efforts, but on the successes

16

of the members of their teams.  Each Individual Defendant also agreed that while working for Vivint, they would "not provide any Sales Duties for any other company without the prior, express written consent of a Vice President or higher-level employee of SHP or Vivint, Inc."  (*Id.*)

59.     The Employment Agreement contains a number of provisions concerning Vivint's confidential information.  Each Individual Defendant acknowledged and agreed that Vivint and SHP had invested "substantial time, money, and specialized knowledge" in creating confidential trade secrets.  They acknowledged that "Confidential Information . . . provides [Vivint and SHP] with a competitive advantage over others in the marketplace."  (*Id.* ¶ 18(a).)  Specifically, each Individual Defendant acknowledged and agreed as follows:

> Confidential Information. During Your employment with SHP, You may be told or otherwise exposed to certain Confidential Information (defined below). You understand and acknowledge that SHP and Vivint (collectively the "Company Group") have invested, and continue to invest, substantial time, money, and specialized knowledge into creating a customer base, generating customer and potential customer lists, recruiting, and training a sales force, developing products and services, and improving their offerings in the fields of home security, smart home technology and services, and residential solar. Because of these efforts, the Company Group has created and continues to use and create Confidential Information, which provides the Company Group with a competitive advantage over others in the marketplace. For purposes of this Agreement, "Confidential Information" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, transactions, potential transactions, know-how, trade secrets, computer programs, computer software, applications, databases, compilations, technologies, manuals, records, systems, material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, payroll information, staffing information, personnel information, employee lists, internal controls, security procedures, market studies, sales information, revenue, costs, communications, product plans, inventions, customer information, customer lists, of the Company Group or its businesses or any existing or prospective customer, or of any other person or entity that has entrusted information to the Company Group in confidence. (*Id.* ¶ 18(a).)

60.     Each Individual Defendant agreed to treat all of the Company's Confidential Information as strictly confidential, not to disseminate or make it available in any way, and not to access, copy, or remove it.  Specifically, each Individual Defendant acknowledged and agreed as follows:

> Non-Disclosure & Confidentiality. You agree (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company Group) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company Group and, in any event, not to anyone outside of the direct employ of the Company Group except as required in the performance of the Sales Duties; and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company Group, except as required in the performance of the Sales Duties acting on behalf of the Company Group in each instance (and then, such disclosure will be made only within the limits and to the extent of such duties or consent). Nothing in this paragraph will be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order.  (*Id.* ¶ 18(b).)

61.     In addition, the Employment Agreements contain two express non-solicitation provisions, applying to Plaintiffs' employees and customers respectively.  Specifically, each Individual Defendant acknowledged and agreed as follows:

> c. Non-Solicitation & Non-Hire of Personnel. You agree that during the Term and for a period of 18 months immediately following the end of the Term, You will not, in any capacity (e.g., on  Your behalf or on behalf of another person or entity), directly or indirectly, regardless of who initiates the contact, (i) solicit, encourage, assist, or attempt to influence an employee or consultant of Vivint or SHP to leave the employ of Vivint or SHP; or (ii) hire, employ, recruit, or solicit an employee or consultant of Vivint or SHP.

> d. Non-Solicitation of Customers. You agree that during the Term and for a period of three years immediately following the end of the Term, You will not, in any capacity (e.g., on Your own behalf or on behalf of another person or entity) directly

or indirectly, regardless of who initiates the contact, solicit, encourage, assist, or attempt to influence any customer of SHP or Vivint who lives within 100 miles of a location where You performed the Sales Duties, to (i) terminate, cancel, or not renew any contract with SHP or Vivint or (ii) enter into a contract with another company for services or products that are similar to or competitive with those of Vivint or its official solar partners. This Section 18.d ("Non-Solicitation of Customers") will not apply If Your principal work location is in the State of California. (*Id.* ¶¶ 18(c) and (d).)

62.     The Agreements also contain a "Blue Penciling" provision, providing that, if the non-solicitation provisions were found to be unenforceable, the provisions may be "modif[ied] and enforce[d] . . . to the maximum extent that is reasonable under the circumstances at that time." (*E.g.*, *id.* ¶ 18(e).)

63.     Finally, in the Employment Agreements, the Individual Defendants acknowledged and agreed that any breach of the above provisions would cause "immediate and irreparable harm" to SHP and would entitle SHP to injunctive relief, as well as liquidated damages. (*Id.* ¶ 18(f).)

64.     Second, in addition to the Employment Agreements, each Individual Defendant also was a participant in the Vivint 2020 Omnibus Incentive Plan, pursuant to which each was granted Restricted Stock Units in Plaintiff Vivint Smart Home, Inc. Each Individual Defendant received a grant of such Units on March 22, 2022 (and had done so in previous years as well). As an express requirement of accepting these grants, each Individual Defendant had to acknowledge and agree to the Restricted Stock Unit Agreement attached to the grant (the "RSU Agreements"). (*See* Ex. 5 (Rossiter Mar. 22, 2022 Restricted Stock Unit Grant Notice (Time-Based Restricted Stock Units)); Ex. 6 (Rossiter Mar. 22, 2022 Restricted Stock Unit Grant Notice (Performance-Based Restricted Stock Units)); Exs. 7 - 14 (equivalent agreements for Defendants Andersen, Lords, and Shaw).)

65.     Each RSU Agreement is identical. In Paragraph 15(a), each Individual Defendant "acknowledge[d] and recognize[d] the highly competitive nature of the businesses of the Company

[Vivint Smart Home, Inc.] and its Affiliates."  Accordingly, each Individual Defendant agreed in his capacity as a company equity holder to the provisions of an appendix which contains a list of Restrictive Covenants.

66.    The Individual Defendants also agreed that "in the event of [a] breach or threatened breach" of these covenants, "remedies at law . . . would be inadequate and the Company would suffer irreparable damages as a result of such breach or threatened breach."  (*E.g.*, Ex. 5 (Rossiter Time-Based RSU Agreement), ¶ 15(a).)  Vivint is expressly permitted to "obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available."  (*Id.*)  Specifically, each Individual Defendant acknowledged and agreed as follows:

> a. Participant acknowledges and recognizes the highly competitive nature of the businesses of the Company and its Affiliates and accordingly agrees, in Participant's capacity as an equity (and/or equity-based Award) holder in the Company, to the provisions of Appendix A to this Restricted Stock Unit Agreement (the "Restrictive Covenants").  Participant acknowledges and agrees that the Company's remedies at law for a breach or threatened breach of any of the provisions of Section 1 of Appendix A (or a material breach or material threatened breach of any of the provisions of Section 2 of Appendix A of this Restricted Stock Unit Agreement) would be inadequate and the Company would suffer irreparable damages as a result of such breach or threatened breach. In recognition of this fact, Participant agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Company, without posting any bond, shall be entitled to cease making any payments or providing any benefit otherwise required by this Restricted Stock Unit Agreement and obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available. Notwithstanding the foregoing and Appendix A, certain provisions of Appendix A shall not apply to the Participant (or shall be adjusted as set forth in Appendix A) if Participant's principal place of employment is located in a state specified in Appendix A or any other jurisdiction where Sections 1(a)(i) or 1(a)(ii) would not be enforced as a matter of law. The Restricted Stock Units granted hereunder shall be subject to Participant's continued compliance with such restrictions. For the avoidance of doubt, the Restrictive Covenants contained in this Restricted Stock Unit Agreement are in addition to, and not in lieu of, any other restrictive covenants or similar covenants or agreements between the Participant and the Company or any of its Affiliates.  (*Id.* ¶ 15(a).)

67.     The covenants in the Appendix to the RSU Agreements include a non-compete agreement and several non-solicitation agreements.  Specifically, the Individual Defendants agreed that, for a period of one year following the date their employment with Plaintiffs terminated, they would not solicit any of Plaintiffs' then-current or prospective clients or customers (*see id.* App'x A, ¶ 1(a)(i)); compete with any of Plaintiffs under certain parameters (*id.* ¶ 1(a)(ii)); or solicit or encourage any employee of Plaintiffs' to leave Plaintiffs' employment, or hire certain high-level employees of Plaintiff (*id.* ¶ 1(a)(iv)).  The full text of these covenants is set forth below:

## Appendix A

### Restrictive Covenants

1.     <u>Non-Competition; Non-Solicitation; Non-Disparagement</u>.

(a)     The Participant acknowledges and recognizes the highly competitive nature of the businesses of the Company and its Affiliates and Subsidiaries, and accordingly agrees as follows:

(i)     During the Participant's employment with the Company or its Affiliates or Subsidiaries (the "<u>Employment Term</u>") and for a period of one year following the date the Participant ceases to be employed by the Company or its Affiliates or Subsidiaries (the "<u>Restricted Period</u>"), the Participant will not, whether on the Participant's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever (for the purposes of this Appendix A, a "<u>Person</u>"), directly or indirectly solicit or assist in soliciting the business of any then-current or prospective client or customer of any member of the Restricted Group in competition with the Restricted Group in the Business.

(ii)     During the Restricted Period, the Participant will not directly or indirectly:

(A)     engage in the Business anywhere in the United States, or in any geographical area that is within 100 miles of any geographical area where the Restricted Group engages in the Business, including, for the avoidance of doubt, by entering into the employment of or rendering any services to a Core Competitor, except where such employment or services do not relate in any manner to the Business;

(B)     acquire a financial interest in, or otherwise become actively involved with, any Person engaged in the Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

(C)     intentionally and adversely interfere with, or attempt to adversely interfere with, business relationships between the members of the Restricted Group and any of their clients, customers, suppliers, partners, members or investors.

(iii)     Notwithstanding anything to the contrary in this Appendix A, the Participant may, directly or indirectly own, solely as an investment, securities of any Person engaged in a Business (including, without limitation, a Core Competitor) which are publicly traded on a national or regional stock exchange or on the over-the-counter market if the Participant (i) is not a controlling person of, or a member of a group which controls, such person and (ii) does not, directly or indirectly, own 2% or more of any class of securities of such Person.

(iv)     During the Employment Term and the Restricted Period, the Participant will not, whether on the Participant's own behalf or on behalf of or in conjunction with any Person, directly or indirectly:

(A)     solicit or encourage any employee of the Restricted Group to leave the employment of the Restricted Group;

(B) hire any executive-level employee, key personnel, or manager-level employee (i.e., any operations manager or district sales manager) who was employed by the Restricted

Group as of the date of the Participant's Termination or who left the employment of the Restricted Group coincident with, or within one year prior to or after, the Participant's Termination; or

       (C)    encourage any consultant of the Restricted Group to cease working with the Restricted Group.

68.    Notably, Sunrun is named specifically in each RSU Agreement as a "Core Competitor" with whom the Individual Defendants agreed they would not work or solicit employees or customers on its behalf.  (*Id.* ¶ 1(a)(v)(B).)

**Sunrun's Scheme to Raid Vivint Employees**

69.    Beginning in mid-2023, Sunrun began to implement its scheme to raid Vivint's solar business, stealing Vivint's key managers and sales representatives with a singular purpose: to unfairly compete with Vivint by using illegal and improper means to induce Vivint employees to breach their contractual obligations and to steal Vivint confidential information and trade secrets.  To date, Sunrun, working with the Individual Defendants, has poached approximately 10 percent of Vivint's most successful sales representatives to Sunrun.

70.    Sunrun's scheme began no later than June 2023 when a Vice President at Sunrun named Tyler Williams actively worked to recruit Defendant Jaycen Shaw, inviting him to an NBA game and offering him a significant amount of money to leave Vivint and join Sunrun.

71.    Rather than immediately leave Vivint to join Sunrun, Shaw conspired with Sunrun for months first to solicit Vivint employees for Sunrun while continuing to work for Vivint, and now to plan the instant raid.

72.    For example, in July 2023, there was a retreat for sales personnel in St. George, Utah.  Sunrun and Shaw decided to take advantage of the opportunity gathered by this retreat, which created a target-rich environment to cross-recruit Vivint's sales leaders.

73.     In violation of his fiduciary duties and contractual obligations to Vivint, and upon information and belief at the direction of Sunrun, Shaw began to actively solicit top Vivint sales representatives at the retreat for Sunrun, explaining that Sunrun would offer them a lot of money to leave Vivint.  The sales representatives who were approached by Shaw included successful and long-tenured Vivint regional managers.

74.     Around this same time in the summer of 2023, Shaw moved to California, continuing to solicit Vivint sales representatives in Utah, while still ostensibly working for Vivint. Upon information and belief, one reason that Sunrun relocated Shaw to California was because Sunrun suggested he do so because California's employment laws disfavor restrictive covenants, such as non-solicitation agreements.

75.     Following the retreat, Sunrun and Shaw's solicitation of Vivint's top sales representatives continued, including multiple trips to Utah to solicit Vivint's Utah employees. Various Vivint managers became suspicious of Shaw's conduct and even questioned his loyalty to Vivint.  In response, Shaw repeatedly lied, stating that he had no intention of leaving Vivint.

76.     Between November 27 and December 4, 2023, a large segment of Shaw's sales team traveled to California, ostensibly for a "blitz" sales trip on behalf of Vivint, as Shaw had misrepresented was the intention of the trip.  As Vivint now knows, only a few employees, mostly new to Vivint, were dropped off in neighborhoods to engage in a sales effort—the rest went with Shaw to a recruiting lunch with Sunrun.

77.     In December 2023, Shaw finally and for the first time told Vivint his intent to join Sunrun, and Vivint terminated him.

78.     Shaw's solicitation of Vivint sales representatives on behalf of Sunrun is ongoing.

79.     Indeed, Sunrun's unlawful raiding is now picking up significantly more steam.  On January 9, 2024, Brad Rossiter resigned from Vivint to join Sunrun.  The very next day, two of the sales managers directly reporting to Rossiter—Andersen and Lords—sent one line resignation emails to Vivint, also leaving to join Sunrun.

80.     On the day he resigned, Rossiter told a senior executive at Vivint that he would do so "the right way."  Rossiter was well aware that he and his sales representatives had agreed to restrictive covenants prohibiting them from competing with Vivint or soliciting Vivint's employees and customers.

81.     In fact, in late January 2022, in a series of emails, Rossiter had previously negotiated with Sunrun's Chief Revenue Officer and its Senior Vice President with respect to an employee Sunrun hired away from Vivint that needed a release from his obligations to Vivint before he could work for Sunrun.  Despite his promises to Vivint and his and Sunrun's knowledge of the restrictive covenants, when he left Vivint, Rossiter recruited top Vivint sales representatives and managers, including Andersen and Lords, to join him at Sunrun.

82.     Defendants Andersen and Lords, as well as the other sales representatives they and Rossiter recruited to Sunrun had already signed employment agreements for the 2023-2024 sales season with Vivint, giving Vivint every indication that they would be returning for the next season. Accordingly, Vivint had already begun to get ready for that season and expended costs relying on this workforce, including, for example, purchasing electronic devices, uniforms, and sales materials.

83.     In addition to the employment agreements, many of the sales representatives had equity grant agreements that contained restrictive covenants prohibiting them from competing with Vivint or soliciting Vivint employees and customers.  *See supra* ¶¶ 56-60.  One sales manager who

reports to Rossiter, and who, upon information and belief is preparing to join Sunrun, sought a copy of his equity agreement on or about January 2, 2024. Rossiter was copied on correspondence that attached copies of all of the equity agreements that the manager signed.

84.     In addition, prior to leaving Vivint, Andersen asked for access to all of Vivint's sales training videos, for which he had no obvious need at that time given that the sales season had recently ended; it is now clear that his request was for the improper purpose of providing the confidential and proprietary Vivint training materials to Sunrun.

85.     The coordinated nature and timing of Rossiter's, Lords's, and Andersen's resignations clearly indicate that Rossiter breached his non-solicitation restrictions with respect to Andersen and Lords.

86.     Further, the events of the past weekend evidence that, prior to their resignations, Rossiter, Lords and Andersen began working with Shaw and Sunrun to identify and solicit their Vivint sales team members. Over the weekend, following Rossiter's, Andersen's, and Lords's resignations, numerous social media posts revealed that multiple Vivint sales representatives who reported to those three Individual Defendants are also leaving Vivint to work for Sunrun. Many of these social media posts include pictures of groups of Vivint employees—underscoring the ongoing improper solicitation. And multiple Vivint employees are pictured in these posts—some even announcing that they are moving to Sunrun—without having provided notice to Vivint of their resignation. The clear inference is that these employees not only are improperly soliciting each other, but also they are delaying providing notice of their resignations to Vivint so that they can continue to access Vivint's proprietary systems, including highly confidential customer and employee data. In fact, at least 20 Vivint employees in Rossiter's downline accessed Vivint's systems over the holiday weekend.

87.     For example on or about January 14, 2024, Andersen reposted an image from the Meraki team Instagram (a popular online social network) account—upon information and belief, Andersen himself  controls the Meraki team Instagram account, which he recently renamed from meraki.vvnt to meraki.pro)—to his personal Instagram account.  The image promoted Sunrun and read, "Meraki Let's Run it.  Sunrun."



88.     The Meraki Instagram account also posted that the "meraki squad will be putting our efforts into dominating at Sun Run," i.e., Andersen's <u>entire</u> Vivint team was leaving together to join Sunrun.



89.     Additionally, on or about January 12, 2024, Krew Ericksen, who is Andersen's cousin and a manager of a Vivint sales team called "Kefi," posted a picture on Instagram with many Vivint sales representatives in front of a Sunrun banner, which stated that, in addition to the Meraki sales team, the Kefi team was also joining Sunrun.  Krew Ericksen has yet to provide notice of his resignation to Vivint.



90.     The post stated that the Kefi team had "entered the transfer portal"—an analogy to the NCAA transfer portal through which athletes can leave their colleges and transfer to a new school. Of course, unlike the NCAA, these representatives had signed contracts to work for Vivint, and were prohibited from soliciting their peers to a competitor like Sunrun. Indeed, the "transfer portal" is a common theme used by Sunrun to advertise new signings and solicit sales representatives to Sunrun.

91.     Numerous other Vivint sales representatives have also posted on Instagram, sharing the same or very similar pictures of them with their Vivint sales team, now promoting Sunrun. Many of the posts similarly refer to the name of their Vivint sales team (e.g., "Meraki" "Kefi" or "Meta") and profess that the team is leaving Vivint to go to Sunrun. The posts frequently state "Let's run it," which upon information and belief is a reference to Sunrun. Many of the posts also speak glowingly of Vivint, with the employees stating that they are "grateful" for their time

at the Company and thus underscoring that the employees are leaving purely as a result of improper solicitation.  For example:

















92.     These posts are emblematic of a far-reaching solicitation campaign—they show that these sales representatives—including Rossiter, Andersen, and Lords—solicited each other to Sunrun, and coordinated their resignations and departures from Vivint.  The various posts praising Vivint also make clear that these former Vivint employees would not have left, but for the effort by Sunrun and their former Vivint managers to recruit them.

93.     Upon information and belief, the Defendants solicited and hired away these employees en masse as part of a pre-planned and coordinated effort orchestrated by the Defendants to harm Vivint's business and bolster their competing enterprise.

94.     Upon information and belief, when it coordinated with the Individual Defendants to solicit Vivint's employees, Sunrun was aware of the contractual obligations they owed to Vivint.  Such restrictive covenants for sales representatives are standard and commonly used within the industry.  Indeed, based solely on documents that Vivint has been able to locate from publicly available sources, Sunrun itself requires executives to sign, at least, Confidentiality, Inventions Assignment, and Restrictive Covenant Agreements.

95.     There is every indication that the employees that are the targets of Defendants' unlawful solicitation efforts (described further below) are attempting to take Vivint's confidential trade secret information with them as they leave.  For example, the Vivint sales representatives whom Defendants targeted in their solicitation campaign have tried to access their Vivint office accounts over the holiday weekend of January 13-15, even though they have already announced on social media that they are leaving Vivint, even though Vivint is in the down time in between sales periods, and even though it was a holiday weekend.  Continuing to access their Vivint office accounts after leaving the company suggests that these sales representatives may be trying to

gather Vivint confidential trade secret information to solicit other Vivint employees or otherwise aid their employment at Sunrun.

### FIRST CAUSE OF ACTION
**Breach of Contract**
**(Rossiter)**

96.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

97.    The contracts attached as Exhibits 4-6 are binding and enforceable contracts between Rossiter and Plaintiffs.

98.    Plaintiffs have fully performed their obligations under the contracts attached as Exhibits 4-6.

99.    Rossiter materially breached his contractual obligations to Plaintiffs in at least the following ways: misappropriating Plaintiffs' confidential and proprietary business information; accepting employment competing with Vivint; soliciting, diverting, or hiring away current employees from Plaintiffs; and using Plaintiffs' technology to plan the raiding of Plaintiffs' employees.

100.    Rossiter's wrongful conduct has damaged Plaintiffs in an amount to be proven at trial and is the direct and proximate cause of irreparable harm to Plaintiffs.  *See, e.g.*, Ex. 4 (Rossiter 2022-2023 Employment Agreement) ¶ 18(f)); Ex. 5 (Rossiter Mar. 22, 2022 RSU Agreement) ¶ 15(a).)

101.    Rossiter will continue to breach his obligations to Plaintiffs, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### SECOND CAUSE OF ACTION
**Breach of Contract**
**(Lords)**

102.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

103.    The contracts attached as Exhibits 2, 10-11 are binding and enforceable contracts between Lords and Plaintiffs.

104.    Plaintiffs have fully performed their obligations under the contracts attached as Exhibits 2, 10-11.

105.    Lords materially breached his contractual obligations to Plaintiffs in at least the following ways: misappropriating Plaintiffs' confidential and proprietary business information; accepting employment competing with Vivint; soliciting, diverting, or hiring away current employees from Plaintiffs; and using Plaintiffs' technology to plan the raiding of Plaintiffs' employees.

106.    Lords's wrongful conduct has damaged Plaintiffs in an amount to be proven at trial and is the direct and proximate cause of irreparable harm to Plaintiffs.  *See, e.g.*, Ex. 2 (Lords 2023-2024 Employment Agreement) ¶ 18(f)); Ex. 10 (Lords Mar. 22, 2022 RSU Agreement) ¶ 15(a).)

107.    Lords will continue to breach his obligations to Plaintiffs, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### THIRD CAUSE OF ACTION
**Breach of Contract**
**(Andersen)**

108.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

109.    The contracts attached as Exhibits 1, 7-9 are binding and enforceable contracts between Andersen and Plaintiffs.

110.    Plaintiffs have fully performed their obligations under the contracts attached as Exhibits 1, 7-9.

111.    Andersen materially breached his contractual obligations to Plaintiffs in at least the following ways: misappropriating Plaintiffs' confidential and proprietary business information; accepting employment competing with Vivint; soliciting, diverting, or hiring away current employees from Plaintiffs; and using Plaintiffs' technology to plan the raiding of Plaintiffs' employees.

112.    Andersen's wrongful conduct has damaged Plaintiffs in an amount to be proven at trial and is the direct and proximate cause of irreparable harm to Plaintiffs.  *See, e.g.*, Ex. 1 (Andersen 2023-2024 Employment Agreement) ¶ 18(f)); Ex. 7 (Andersen Mar. 22, 2022 RSU Agreement) ¶ 15(a).

113.    Andersen will continue to breach his obligations to Plaintiffs, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### FOURTH CAUSE OF ACTION
### Breach of Contract
### (Shaw)

114.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

115.    The contracts attached as Exhibits 3, 12-14 are binding and enforceable contracts between Shaw and Plaintiffs.

116.    Plaintiffs have fully performed their obligations under the contracts attached as Exhibits 3, 12-14.

117. Shaw materially breached his contractual obligations to Plaintiffs in at least the following ways: misappropriating Plaintiffs' confidential and proprietary business information; accepting employment competing with Vivint; soliciting, diverting, or hiring away current employees from Plaintiffs; and using Plaintiffs' technology to plan the raiding of Plaintiffs' employees.

118. Shaw's wrongful conduct has damaged Plaintiffs in an amount to be proven at trial and is the direct and proximate cause of irreparable harm to Plaintiffs. *See, e.g.*, Ex. 3 (Shaw 2023-2024 Employment Agreement) ¶ 18(f)); Ex. 12 (Shaw Mar. 22, 2022 RSU Agreement) ¶ 15(a).)

119. Shaw will continue to breach his obligations to Plaintiffs, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### FIFTH CAUSE OF ACTION
**Breach of the Covenant of Good Faith and Fair Dealing**
**(Rossiter, Lords, Andersen, Shaw)**

120. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

121. The contracts attached as Exhibits 1-14 are binding and enforceable contracts between Plaintiffs and each of the Individual Defendants. A covenant of good faith and fair dealing inheres to these contracts.

122. Rossiter, Lords, Andersen, and Shaw breached the duty of good faith and fair dealing by, among other things: failing to act in a manner consistent with the common purpose of the Agreement, by deceiving Vivint that they intended to work the 2023/2024 summer sales season, by soliciting Vivint sales representatives to join Sunrun while working for Vivint, and by using Vivint's resources, confidential information, and technology to cross-recruit Vivint's sales representatives to work for Sunrun.

123.    As a direct result of the Individual Defendants' breaches of the duty to act in good faith and deal fairly, Plaintiffs have suffered actual damages in an amount to be proven at trial.

124.    The Individual Defendants will continue to breach their obligations to Plaintiffs, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

*SIXTH CAUSE OF ACTION*
**Tortious Interference with Contract**
**(Sunrun)**

125.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

126.    The contracts attached as Exhibits 1 through 14 contain restrictive covenants that prohibit the Individual Defendants Rossiter, Lords, Andersen, and Shaw from competing, soliciting or attempting to induce any of Plaintiffs' employees to terminate his or her employment with Plaintiffs.

127.    Sunrun knew, or should have known, of the existence of the restrictive covenants contained in these contracts.

128.    Despite such knowledge, Sunrun permitted, caused, encouraged, and/or induced Rossiter, Lords, Andersen, Shaw and others to breach the restrictive covenants contained in the contracts.

129.    Sunrun has knowingly and intentionally enjoyed the economic benefits of these breaches.

130.    There was no privilege or justification for Sunrun's conduct.

131.    Sunrun tortiously interfered with Plaintiffs' rights under these contracts through a wrongful means, including but not limited to: aiding and abetting breaches of the duty of loyalty, luring Plaintiffs' employees to California to meet with Sunrun under the false pretenses of a Vivint

work trip, making false claims about Vivint's business, and otherwise engaging in a conspiracy to raid Vivint's sales force.

132.    As a direct and proximate result of the wrongful conduct by Sunrun, Plaintiffs have and continue to suffer damages in an amount to be proven at trial.

133.    Sunrun will continue such wrongful conduct, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

*SEVENTH CAUSE OF ACTION*
**Breach of Fiduciary Duty**
**(Rossiter, Lords, Andersen, Shaw)**

134.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

135.    Rossiter, Lords, Andersen, and Shaw each had a fiduciary obligation to Plaintiffs not to compete with Plaintiffs or engage in conduct that would cause Plaintiffs to sustain injury or loss.

136.    Rossiter, Lords, Andersen, and Shaw breached their fiduciary duties to Plaintiffs in at least the following ways: soliciting, hiring and enticing Plaintiffs' employees away from their employment to work at Sunrun while still employed by Plaintiffs; making misrepresentations about Vivint's business in furtherance of their raiding efforts; luring Plaintiffs' employees to meet with Sunrun under the false pretenses of Vivint work events; using Vivint work time and resources to further the business interests of Sunrun; causing Plaintiffs' employees to breach their contractual agreements with Plaintiffs; and upon information and belief, diverting potential customers and resources to Sunrun while still employed by Plaintiffs.

137.    Rossiter's, Lords's, Andersen's, and Shaw's activities were willful, deliberate, and malicious.

138.     As a direct and proximate result of the wrongful conduct by Rossiter, Lords, Andersen, and Shaw, Plaintiffs have and continue to suffer damages in an amount to be proven at trial.

139.     Rossiter, Lords, Andersen and Shaw continue such wrongful conduct and Plaintiffs will be irreparably harmed thereby unless such activities are enjoined by this Court.

### EIGHTH CAUSE OF ACTION
**Misappropriation of Trade Secrets, Utah Code Ann. §§ 13-24-1 to -9
(All Defendants)**

140.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

141.     As part of their employment, Rossiter, Lords, Andersen, and Shaw had access to Plaintiffs' trade secrets, including but not limited to, confidential nonpublic sales, compensation and customer information.

142.     Plaintiffs have taken reasonable measures to maintain the secrecy of Plaintiffs' trade secrets, including requiring password protection and two-factor authentication, limiting access on a need-to-know basis, and requiring its employees to sign confidentiality agreements.

143.     Plaintiffs' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.  Plaintiffs have expended significant time and resources to develop Plaintiffs' trade secrets.

144.     Defendants misappropriated Plaintiffs' trade secrets in one or more of the following ways:

a)  By acquiring Plaintiffs' trade secrets while knowing or having reason to know that those trade secrets were acquired by improper means;

b)  By disclosing and/or using Plaintiffs' trade secrets without Plaintiffs' consent after having used improper means to acquire knowledge of Plaintiffs' trade secrets;

c)  By disclosing and/or using Plaintiffs' trade secrets without Plaintiffs' consent while, at the time of disclosure or use, knowing or having reason to know that their knowledge of those trade secrets was: derived from or through a person who had utilized improper means to acquire those trade secrets; acquired under circumstances giving rise to a duty to maintain those trade secrets' secrecy or limit their use; or derived from or through a person who owed a duty to Vivint to maintain the secrecy or limit the use of Plaintiffs' trade secrets.

145.   For example, Defendant Sunrun acquired Plaintiffs' trade secrets from Defendants Rossiter, Lords, Andersen, and Shaw while knowing or having reason to know that those trade secrets were acquired by improper means (*e.g.*, breach of a duty to maintain the secrecy of that information).

146.   Defendants Rossiter, Lords, Andersen, and Shaw disclosed Plaintiffs' trade secrets to Sunrun and/or used Plaintiffs' trade secrets without Plaintiffs' consent and after having acquired Plaintiffs' trade secrets while in Plaintiffs' employ and under a duty to maintain their secrecy and limit their use.

147.   Defendants took such actions willfully, maliciously, and/or in reckless disregard for Plaintiffs' rights, in that they knew, or had reason to know, pursuant to the terms of the Individual Defendants' Employment Agreements, that Plaintiffs' employees were not authorized to use the Plaintiffs' trade secrets in competition with Plaintiffs or for their own commercial benefit.

148.     As a result of Defendants' misappropriation of the Plaintiffs' trade secrets, Plaintiffs have suffered and will continue to suffer actual damages in an amount to be proven at trial.

149.     Defendants will continue to misappropriate Plaintiffs' trade secrets, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### NINTH CAUSE OF ACTION
### Misappropriation of Trade Secrets, DTSA 18 U.S.C 1836
### (All Defendants)

150.     Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

151.     As part of their employment, Rossiter, Lords, Andersen, and Shaw had access to Plaintiffs' trade secrets including but not limited to, confidential nonpublic sales, compensation and customer information.

152.     Plaintiffs have taken reasonable measures to maintain the secrecy of Plaintiffs' trade secrets, including requiring password protection and two-factor authentication, limiting access on a need-to-know basis, and requiring its employees to sign confidentiality agreements.

153.     Plaintiffs' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from the disclosure or use of the information.  Plaintiffs have expended significant time and resources to develop Plaintiffs' trade secrets.

154.     Defendants misappropriated Plaintiffs' trade secrets in one or more of the following ways:

a)  By acquiring Plaintiffs' trade secrets while knowing or having reason to know that those trade secrets were acquired by improper means;

42

b) By disclosing and/or using Plaintiffs' trade secrets without Plaintiffs' consent after having used improper means to acquire knowledge of Plaintiffs' trade secrets;

c) By disclosing and/or using Plaintiffs' trade secrets without Plaintiffs' consent while, at the time of disclosure or use, knowing or having reason to know that their knowledge of those trade secrets was: derived from or through a person who had utilized improper means to acquire those trade secrets; acquired under circumstances giving rise to a duty to maintain those trade secrets' secrecy or limit their use; or derived from or through a person who owed a duty to Plaintiffs to maintain the secrecy or limit the use of Plaintiffs' trade secrets.

155.    For example, Defendant Sunrun acquired Plaintiffs' trade secrets from Defendants Rossiter, Lords, Andersen, and Shaw while knowing or having reason to know that those trade secrets were acquired by improper means (*e.g.*, breach of a duty to maintain the secrecy of that information).

156.    Defendants Rossiter, Lords, Andersen, and Shaw disclosed Plaintiffs' trade secrets to Sunrun and/or used Plaintiffs' trade secrets without Plaintiffs' consent and after having acquired Plaintiffs' trade secrets while in Plaintiffs' employ and under a duty to maintain their secrecy and limit their use.

157.    Defendants took such actions willfully, maliciously, and/or in reckless disregard for Plaintiffs' rights, in that they knew, or had reason to know, pursuant to the terms of Rossiter's, Lords's, Andersen's, and Shaw's Employment Agreements, that Plaintiffs' employees were not authorized to use the Plaintiffs' trade secrets in competition with Plaintiffs or for their own commercial benefit.

158.    As a result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered and will continue to suffer actual damages in an amount to be proven at trial.

159.    Defendants will continue to misappropriate Plaintiffs' trade secrets, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

160.    Pursuant to 18 U.S.C. § 1836(b)(3)(C), Plaintiffs are entitled to exemplary damages for willful and malicious misappropriation of Plaintiffs' trade secrets.

161.    Pursuant to 18 U.S.C. § 1836(b)(3)(D), Plaintiffs are entitled to recovery of its attorneys' fees and costs.

### TENTH CAUSE OF ACTION
### Civil Conspiracy
### (All Defendants)

162.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

163.    The Defendants combined with the objective to unlawfully raid Vivint's sales representative leaders.

164.    There was a meeting of the minds among the Defendants to accomplish this objective as evidenced by the commonality, timing, and method of the mass resignations of Rossiter's, Lords's, Andersen's, and Shaw's Vivint sales teams.

165.    The Defendants used one or more unlawful act to accomplish this objective including breaches of fiduciary duty, aiding and abetting breaching of fiduciary duty, misrepresentations, and inducing Vivint sales representative to travel to California to meet with Sunrun under the false pretenses of a Vivint sales trip.

166.    As a result of Defendants' unlawful conspiracy to raid Vivint's sales leaders, Plaintiffs have suffered and will continue to suffer actual damages in an amount to be proven at trial.

167.    Defendants will continue their unlawful conspiracy, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### ELEVENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
### (All Defendants)

168.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 95 of the Complaint.

169.    Rossiter, Lords, Andersen, and Shaw each had a fiduciary obligation to Plaintiffs not to compete with Plaintiffs or engage in conduct that would cause Plaintiffs to sustain injury or loss.

170.    Rossiter, Lords, Andersen, and Shaw breached their fiduciary duties to Plaintiffs in at least the following ways: soliciting, hiring and enticing Plaintiffs' employees away from their employment to work at Sunrun while still employed by Plaintiffs; making misrepresentations about Vivint's business in furtherance of their raiding efforts; luring Plaintiffs' employees to meet with Sunrun under the false pretenses of Vivint work events; using Vivint work time and resources to further the business interests of Sunrun; causing Plaintiffs' employees to breach their contractual agreements with Plaintiffs; and upon information and belief, diverting potential customers and resources to Sunrun while still employed by Plaintiffs.

171.    The Individual Defendants knowingly joined, aided and participated with each other in these fiduciary breaches.

172.    Sunrun also knowingly encouraged, joined, aided and participated with the Individual Defendants in these fiduciary breaches.

173.    As a result of Defendants' aiding and abetting breaches of fiduciary duty, Plaintiffs have suffered and will continue to suffer actual damages in an amount to be proven at trial.

174.    Defendants will continue their aiding and abetting breaches of fiduciary duty, and Plaintiffs will be irreparably harmed thereby, unless such activities are enjoined by this Court.

### *PRAYER FOR RELIEF*

Plaintiffs respectfully requests that this Court enter judgment in its favor and against Defendants, as follows:

(a) An injunction against Defendants Rossiter, Lords, Andersen, and Shaw prohibiting any further breaches of their contractual obligations to Plaintiffs;

(b) An injunction against Defendant Sunrun prohibiting it from continuing to tortiously interfere with Plaintiffs' contractual agreements with Rossiter, Lords, Andersen, and Shaw;

(c) An injunction against Defendants prohibiting them from using, disclosing, or possessing Plaintiffs' trade secrets;

(d) That judgment be entered for Plaintiffs against Defendants for all general, compensatory, punitive, and liquidated damages in an amount to be proven at trial;

(e) That Plaintiffs be awarded all available statutory damages, prejudgment and post-judgment interests, as applicable, at the highest lawful amount;

(f) That Plaintiffs be awarded all attorneys' fees and costs it has, and will, incur in connection with this action; and

(g) Such other and further relief as the Court deems just and appropriate under the circumstances.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury.

DATED this 15th day of January, 2024.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

/s/ Stephen Q. Wood
Michael B. Carlinsky (*pro hac admission forthcoming*)
Rachel E. Epstein (*pro hac admission forthcoming*)
Stephen Q. Wood (12403)
Quinn Emanuel Urquhart & Sullivan, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone: (801) 515-7300
Facsimile: (801) 515-7400
michaelcarlinsky@quinnemanuel.com
rachelepstein@quinnemanuel.com
stephenwood@quinnemanuel.com
*Attorneys for Plaintiffs*