Rachel E. Epstein (*pro hac vice application pending*)
Stephen Q. Wood (12403)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone: (801) 515-7300
Facsimile: (801) 515-7400
rachelepstein@quinnemanuel.com
stephenwood@quinnemanuel.com

*Attorneys for Plaintiffs*

---

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| VIVINT, INC., a Utah corporation; VIVINT SMART HOME, INC., a Delaware corporation; SMART HOME PROS, INC., a Utah corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>SUNRUN, INC., a Delaware corporation; BRADLEY ROSSITER, an individual; ZACKARY ANDERSEN, an individual; NATHAN LORDS, an individual; JAYCEN SHAW, an individual,<br><br>        Defendants. | **MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR (1) PRELIMINARY INJUNCTION AND, (2) IN THE ALTERNATIVE, EXPEDITED DISCOVERY**<br><br>Civil No. 2:24-cv-34-JNP<br><br>Judge Jill N. Parrish |

**<u>TABLE OF CONTENTS</u>**

**Page**

STATEMENT OF FACTS ...................................................................................................3

    A.    Vivint's Solar Sales Model And Sales Force ...........................................3

    B.    The Importance Of Vivint's Solar Customer Leads .................................5

    C.    Sunrun Begins Its Raid on Vivint's Sales Force......................................6

    D.    Vivint Refuses To Sell Sunrun Its Solar Leads And Sunrun Continues Its Raid ....................................................................................7

    E.    Before Leaving, The Individual Defendants And Others Accessed Vivint's Trade Secrets..................................................................10

    F.    The Impact Of Sunrun's Raid On Vivint .................................................11

ARGUMENT ....................................................................................................................12

I.    LEGAL STANDARD.............................................................................................12

    A.    Vivint Is Likely To Prevail On Its Breach Of Contract Claims.............12

        1.    The Restrictive Covenants Are Valid And Enforceable. ..............13

        2.    The Individual Defendants Breached The Restrictive Covenants.................................................................15

        3.    The Individual Defendants Breached Their Confidentiality Obligations. ................................................16

    B.    Vivint Is Likely To Prevail On Its Tortious Interference Claim.............17

    C.    Defendants Misappropriated Vivint's Trade Secrets...............................18

        1.    Existence of a Trade Secret...........................................................19

        2.    Misappropriation ...........................................................................21

III.    VIVINT HAS SHOWN IRREPARABLE HARM.............................................21

IV.    A BALANCING OF THE EQUITIES WEIGHS IN FAVOR OF AN INJUNCTION ......................................................................................24

V.    AN INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST ........24

VI.    IN THE ALTERNATIVE, EXPEDITED DISCOVERY IS APPROPRIATE .................25

CONCLUSION...................................................................................................................25

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Advanced Recovery Sys., LLC v. Am. Agencies, LLC,*
  2016 WL 6916539 (D. Utah Sept. 28, 2016) (unpub.) ......................................................19, 21

*Agel Enters., LLC v. Schroeder,*
  2008 WL 4753727 (D. Utah Oct. 28, 2008) (unpub.)..............................................................22

*Am. Equip. Sys. v. Chester,*
  2023 WL 8261427 (D. Utah Nov. 29, 2023) (unpub.) .........................................................25

*Applied Predictive Techs., Inc. v. Marketdial, Inc.,*
  2020 WL 6940736 (D. Utah Nov. 25, 2020) (unpub.) .....................................................18, 19

*Ash Cap. v. Jensen,*
  2011 WL 12454666 (Utah Dist. Ct. Sep. 02, 2011) (unpub.).................................................13

*Bad Ass Coffee Co. of Hawaii v. JH Nterprises, L.L.C.,*
  636 F. Supp. 2d 1237 (D. Utah 2009)........................................................................14, 23, 24

*Bakotic v. Bako Pathology LP,*
  2018 WL 6601172 (Del. Super. Ct. Dec. 10, 2018) (unpub.).................................................15

*C.R. Eng. v. Swift Transp. Co.,*
  437 P.3d 343 (Utah 2019)........................................................................................................17

*ClearOne Commc'ns, Inc. v. Chiang,*
  2007 WL 3231524 (D. Utah Oct. 30, 2007) ...........................................................................16

*Cordell v. Berger,*
  2001 WL 1516742 (D. Utah Nov. 27, 2001) (unpub.) ...........................................................25

*Core Progression Franchise LLC v. O'Hare,*
  2022 WL 1741836 (10th Cir. May 31, 2022) (unpub.) .....................................................22, 24

*Davis v. Mineta,*
  302 F.3d 1104 (10th Cir. 2002) ..............................................................................................24

*DP Creations, LLC v. Reborn Baby Mart,*
  2021 WL 11585915 (D. Utah Nov. 22, 2021) (unpub.) .........................................................25

*DP Creations, LLC v. Reborn Baby Mart,*
  2022 WL 3108232 (D. Utah Aug. 3, 2022) (unpub.) .............................................................23

*Elkay Interior Sys. Int'l, Inc. v. Weiss*,
    2022 WL 17961568 (D. Del. Dec. 27, 2022) (unpub.)........................................................12

*Equifax Servs., Inc. v. Hitz*,
    905 F.2d 1355 (10th Cir. 1990) ...................................................................................22

*Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*,
    505 F. Supp. 2d 1178 (D. Utah 2007)....................................................................19, 21

*First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*,
    2016 WL 6091540 (D. Utah Oct. 18, 2016) .............................................................15

*First Am. Title Ins. Co. v. Nw. Title Ins. Agency*,
    906 F.3d 884 (10th Cir. 2018) (unpub.).....................................................................15

*George v. Davis Sch. Dist.*,
    2023 WL 5000989 (D. Utah Aug. 4, 2023) (unpub.) .................................................12

*Graystone Funding Co., LLC v. Network Funding, L.P.*,
    2021 WL 4460113 (D. Utah Sept. 29, 2021) (unpub.) ..............................................19

*Henry Coffeen III Mgmt., Inc. v. Branch*,
    2017 WL 4271423 (D.N.M. Sept. 25, 2017) (unpub.)................................................19

*Hough Assocs., Inc. v. Hill*,
    2007 WL 148751 (Del. Ch. Jan. 17, 2007) (unpub.) ................................................15

*InnoSys, Inc. v. Mercer*,
    364 P.3d 1013 (Utah 2015)........................................................................................19

*Ivanti, Inc. v. StayLinked Corp.*,
    2019 WL 4645325 (D. Utah Sept. 24, 2019) (unpub.) ..............................................17

*Kan-Di-Ki, LLC v. Suer*,
    2015 WL 4503210 (Del. Ch. July 22, 2015) (unpub.)................................................13

*Kasco Servs. Corp. v. Benson*,
    831 P.2d 86 (Utah 1992).....................................................................................13, 14

*Lifevantage Corp. v. Domingo*,
    208 F. Supp. 3d 1202 (D. Utah 2016) .......................................................................12

*Mountain Am. Credit Union v. Godfrey*,
    2006 WL 2129465 (D. Utah July 28, 2006) (unpub.)................................................19

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
    2019 WL 2536104 (Del. Ch. June 20, 2019) (unpub.) .............................................23

*Neways Inc. v. Mower*,
   543 F. Supp. 2d 1277 (D. Utah 2008) ...................................................................................15

*Paparazzi, LLC v. Sorenson*,
   2022 WL 1606559 (D. Utah May 20, 2022) (unpub.) ............................................................23

*Planned Parenthood Ass'n of Utah v. Herbert*,
   828 F.3d 1245 (10th Cir. 2016) .............................................................................................12

*Prop. Mgmt. Bus. Sols. v. Averitte*,
   2018 WL 4327922 (D. Utah Sept. 10, 2018) (unpub.) .........................................13, 14, 22, 24

*Route App, Inc. v. Heuberger*,
   2023 WL 5334192 (D. Utah Aug. 18, 2023) (unpub.) ............................................................14

*SecurityNational Mortg. Co. v. Chavez*,
   2017 WL 3834745 (D. Utah Aug. 31, 2017) (unpub.) ............................................................15

*SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*,
   -- F. Supp. 3d --, 2023 WL 4463246 (D. Utah July 11, 2023) ...............................................16

*In re Smith*,
   618 B.R. 901 (Bankr. App. 10th Cir. 2020) ...........................................................................17

*Sw. Stainless, LP v. Sappington*,
   582 F.3d 1176 (10th Cir. 2009) .............................................................................................23

*Sys. Concepts, Inc. v. Dixon*,
   669 P.2d 421 (Utah 1983) .....................................................................................................22

*Total Quality Sys., Inc. v. Universal Synaptics Corp.*,
   2023 WL 4238454 (D. Utah June 28, 2023) (unpub.) ...................................................... 19, 20

*TP Group–CI, Inc. v. Vetecnik*,
   2016 WL 5864030 (D. Del. Oct. 6, 2016) (unpub.) .....................................................13, 14, 16

*TruGreen Cos.v. Mower Bros., Inc.*,
   199 P.3d 929 (Utah 2008) .....................................................................................................22

*USA Power, LLC v. PacifiCorp*,
   235 P.3d 749 (Utah 2010) .................................................................................................19, 21

*Vendr, Inc. v. Tropic Techs., Inc.*,
   2023 WL 8789297 (D. Utah Dec. 19, 2023) (unpub.) ......................................................17, 18

**<u>Statutes</u>**

18 U.S.C. § 1836(b)(3)(A)(1) ................................................................................21

Utah Code Ann. § 13-24-3(1) ...............................................................................21

**<u>Other Authorities</u>**

Fed. R. of Civ. P. 65.............................................................................................1

## RELIEF SOUGHT AND GROUNDS FOR RELIEF

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs Vivint, Inc., Vivint Smart Home, Inc., and Smart Home Pros, Inc. (together "Vivint") respectfully move this Court for a preliminary injunction and order:

- Enjoining the Individual Defendants from further breaching the non-competition, non-solicitation, and non-disclosure obligations they contractually owe Vivint;

- Enjoining all Defendants and those acting in active concert or participation from tortiously interfering with the restrictive covenants that Vivint has entered into with the Individual Defendants and other current and former employees of Vivint; and

- Enjoining all Defendants and those acting in active concert or participation from further disclosing, using, or otherwise misappropriating Vivint's trade secrets.

Should the Court find that there is insufficient evidence to support any aspect of this requested relief, Plaintiffs request permission to engage in limited, targeted expedited discovery—as set forth below—in support of the request for a preliminary injunction.  *See* Exhibit A (Proposed Order).

## INTRODUCTION

A preliminary injunction is necessary in this case to stop Defendant Sunrun, Inc.'s ("Sunrun") ongoing, unlawful raid of Vivint's top sales managers and representatives—in knowing violation of those employees' non-competition and non-solicitation covenants—by spreading lies about Vivint's business and stealing Vivint's confidential business information and trade secrets.

Sunrun carefully orchestrated this predatory raid over many months with the aid of now-former Vivint employees Defendants Bradley Rossiter, Zackary Andersen, Nathan Lords, and Jaycen Shaw ("Individual Defendants"), both while they were Vivint employees and after they left to join Sunrun.  It now appears that Shaw began acting as a double-agent for Sunrun no later than Summer 2023, surreptitiously recruiting Vivint's salespeople with Sunrun's help, while continuing to work for Vivint.  Indeed, Shaw and Sunrun went so far as to organize a recruiting trip for Shaw's

downline sales representatives (*i.e.* his direct and indirect reports) to meet with Sunrun's executives in its California offices, *on Vivint's dime*, by telling Vivint it was a sales "blitz" trip to sell for Vivint.  When Vivint finally learned of this deceit, it terminated Shaw in December 2023.

But Sunrun's raid was just beginning.   In January 2024, Defendant Rossiter abruptly resigned from Vivint and moved to Sunrun, followed the next day by two of his team leaders—Defendants Andersen and Lords.  Over the course of the following holiday weekend, the downlines and teams reporting up to Andersen, Lords, and Rossiter all followed.  It now appears that these Defendants were working together and in coordination with Sunrun to orchestrate this mass departure well before their resignations.  To-date, Vivint has lost at least 60 high-producing salespeople as a result of the raid, and the attrition is continuing.  Indeed, Vivint believes that the number is far higher, but it has had to piece together each of the defections through information received from the employees' and their sales team's social media accounts, where the Individual Defendants and their downlines are posting professional quality promotional videos and images, shot at Sunrun's facilities and with Sunrun's help, soliciting still-remaining Vivint sales people to "come Run" at Sunrun.  These posts also confirm the ongoing nature of Sunrun's raid: As recently as ***February 4, 2024***, a former Vivint sales representative posted: "We RUNNIN!!!!! Enough talking, we about to throw down.  ***Missing about 1/4 of our people!  But they'll be here soon!***"

That Sunrun is using improper means to steal Vivint's life blood—it's highly trained salespeople and the confidential information to which they have access—is clear.  Indeed, the defecting employees' social media posts often contain praise for Vivint, including the sentiment that they could not have succeeded "without the support and systems of Vivint."  A number of departed employees have accessed confidential Vivint systems between the time they left Vivint and the time Vivint learned of their departure, and of course Vivint has no way of knowing what

information the Individual Defendants and their teams took, and shared, through low tech means. Thus far, Vivint does know that Sunrun has been using confidential compensation and sales volume information, available only to high-level managerial employees such as the Individual Defendants, to target and solicit additional Vivint employees. And Sunrun itself was attempting, unsuccessfully, to negotiate with Vivint for direct access to Vivint's customer leads until shortly before Rossiter, Lords, and Andersen's resignations.

Since the filing of the Complaint [Dkt. 1] and up through at least February 4, Defendants have continued to solicit Vivint employees and induce them to breach their restrictive covenants. The harm to Vivint is ongoing and unquantifiable. Plaintiffs thus seek a preliminary injunction.

## STATEMENT OF FACTS

### A.    Vivint's Solar Sales Model And Sales Force

Provo-based Vivint was founded in 1999 and has grown to become the second biggest seller, by annual revenue, of home security and home automation systems (together "Smart Home" products) in the United States. Declaration of Joshua Crittenden (Feb. 5, 2024) ("J.C. Dec.) ¶ 3. In 2011, Vivint launched Vivint Solar, Inc. ("Vivint Solar"), a private solar energy company that went public in 2014. *See* Declaration of Evan Pack (Feb. 5, 2024) ("E.P. Dec.") ¶ 4. In October 2020, Sunrun acquired Vivint Solar. *See id.* ¶ 5. Thus, some of Sunrun's current senior personnel are former Vivint employees. *See id.*

In addition to Smart Home products, Vivint also sells residential solar energy systems on behalf of third-party solar installers and financers, who pay Vivint a commission for each sale. *See id.* ¶ 6. Indeed, while Sunrun sells its products directly to consumers, Sunrun itself also utilizes Vivint to sell Sunrun solar systems because it recognizes the value that Vivint brings. *See id.* ¶¶ 27-28. Vivint sells its products, including both Smart Home and solar, through door-to-door sales. *See* J.C. Dec. ¶ 4. Key to Vivint's success is its sales representatives and proprietary sales

training and techniques.  *See id.* ¶¶ 6-17.  Vivint invests heavily in recruiting, training, and retaining its sales force.  *See id.*  In addition, Vivint's sales leaders are particularly valuable to ensuring a successful sales season, because experienced sales leaders, like the Individual Defendants, lead and train downlines of hundreds of representatives. *See id.* ¶ 25.  These sales leaders are themselves incentivized to build teams of successful salespeople because the leaders are compensated in part based on the revenue their "downline" teams earn.  *See id.*  This type of training and retention-incentivization is necessary because in door-to-door sales only a fraction of hired sales representatives complete an entire sales season, and only a fraction of those make a material number of sales.  *See id.* ¶ 10.  Thus, high-producing salespeople, like those in the Individual Defendants' downlines, account for a substantial and material number of Vivint's sales. *See* E.P. Decl. ¶¶ 37-39; *see also* Declaration of Christopher Gerardi (Feb. 6, 2023) ("C.G. Dec.") ¶¶ 53-60.

To protect its investment in recruitment and training, and to ensure that entire downlines do not leave Vivint as a unit, Vivint requires sales representatives to sign annual employment agreements with Plaintiff Smart Home Pros, Inc., a Vivint affiliate ("Employment Agreements"). *See* J.C. Decl. ¶¶ 8, 19.  The Employment Agreements run from October to October, and include confidentiality obligations and a non-solicitation provision barring solicitation of employees or customers during the term of the agreement and for 18 months after employment terminates.  *See* J.C. Dec. Exs. 1-4, ¶¶ 18(a)-(d).  Andersen, Lords, and Shaw each signed an employment agreement for the 2023-2024 sales year.  *See* J.C. Dec. Exs. 2-4.  Rossiter signed an employment agreement for the 2022-2023 sales year, *see* J.C. Dec. Ex. 1, and intentionally avoided signing his 2023-2024 agreement,  *see* J.C. Dec. ¶ 21.  In addition, in return for equity awards, each Individual Defendant signed Restricted Stock Unit Agreements ("RSU Agreements").  The RSU Agreements

include non-disclosure obligations, a covenant not to work for a Core Competitor (defined to include Sunrun) for 12 months following employment, and 12-month customer and employee non-solicitation provisions. *See* J.C. Dec. Exs. 5-8, 10-13, App'x A, ¶¶ 1(a)(i)-(iii).

### B. The Importance Of Vivint's Solar Customer Leads

A key to Vivint's solar sales success has been cross-selling with Vivint Smart Home products. *See* E.P. Dec. ¶¶ 8-26. ████ ATTORNEY'S EYES ONLY ████████

████████████████ *See id.* ¶ 16. ████ ATTORNEY'S EYES ONLY ████

████████████████████████████████████████

████████████████████████████. *See id.* ¶ 23. However, Vivint's Smart Home products can be installed nearly immediately, so the Smart Home "realization rate" (*i.e.* number of contracts converted to actual customers) is much higher than solar industry realization rates. *See id.* ¶ 22.

Importantly, ████ ATTORNEY'S EYES ONLY ████████

████████████████████████████ *See id.* ¶ 23. This is because satisfied Vivint customers who have Smart Home systems installed trust Vivint and are less likely to abandon their solar contracts during the solar installation waiting period. *See id.* ¶ 24. As a result, Vivint expends substantial resources, time, and money on generating cross-selling sales leads. *See id.* ¶ 14. Vivint trains its sales force to identify satisfied Smart Home customers who have purchased Vivint's other products and to interest those customers in a solar system. *See id*. These solar customer "leads" are then stored in Vivint's sales software systems. *See* Declaration of Ryan Gee (Feb. 5, 2024) ("R.G. Dec.") ¶¶ 23-39, 49-52. These leads are extremely valuable because they help sales representatives find and focus their efforts on customers particularly likely to purchase a solar system, rather than cold knocking on doors. *See* E.P. Dec. ¶¶ 8-13.

### C.     Sunrun Begins Its Raid on Vivint's Sales Force

Sunrun's groundwork for its raid of Vivint began no later than June 2023, when Sunrun's Senior Vice President of Sales, a former Vivint executive named Tyler Williams, actively recruited Defendant Jaycen Shaw, one of Vivint's top sales leaders.  Williams invited Shaw to an NBA game and offered him a substantial salary guarantee to leave Vivint and join Sunrun.  *See* J.C. Dec. ¶ 31.  Sunrun also promised to pay Shaw's legal fees and damages should Vivint sue.  *See id*.  Shaw agreed, and then spent months secretly working with Sunrun, while still a Vivint employee, to solicit Vivint employees to Sunrun.  *See id.* ¶ 32.  Indeed, from June 2023 through December 2023, Shaw took active steps to conceal his activities from Sunrun, even signing a new Vivint employment agreement on September 28, 2023, from an address in Utah.  *See* J.C. Dec. Ex. 4.

It is indisputable that Sunrun was well aware that Vivint employees had enforceable restrictive covenants.  Not only is this industry custom, and not only were senior Sunrun employees aware of this from their own time at Vivint Solar, but Sunrun had previously negotiated for releases of former Vivint employees, including in 2022, when Sunrun's Chief Revenue Officer negotiated with Defendant Rossiter (then a senior Vivint employee) for Vivint's release of the restrictive covenants of one of Rossiter's downline.  *See* J.C. Dec. ¶ 49-50.  Thus, as a first step with Shaw, Sunrun instructed him to move to California, telling him that by doing so he could evade liability to Vivint for violation of his restrictive covenants.  *See id.* ¶ 31.  Shaw enacted the plan by telling Vivint colleagues he had moved to California, posting on social media about moving to California to bolster his claim; however, Shaw continued to work in, maintain a residence in, and secretly solicit Vivint sales representatives in Utah.  *See id*.

In December 2023, while he and Sunrun were still actively concealing their partnership, Shaw organized a "blitz" selling trip to Southern California for his Vivint downline sales team.  *See id.* ¶ 34.  Shaw asked Vivint to fly dozens of sales representatives in for the blitz, including

many veteran representatives. *See id.* ¶ 35. Vivint reimbursed these sales representatives' travel and lodging. *See id.* Vivint was surprised to see that at the end of the week-long trip, hardly any accounts had been sold, prompting Vivint to seek explanation. *See id.* As a result of these inquiries, Vivint learned that the trip that Vivint had paid for was in reality a Sunrun solicitation event. *See id.* ¶ 36. Upon arrival in California, rather than organizing sales activities, Shaw had taken the senior sales representatives to Sunrun's California headquarters to meet with Sunrun's executives. *See id.* Vivint then met with Shaw on December 20, 2023; at which point, Shaw confessed his intent to move to Sunrun, and Vivint terminated his employment. *See id.* ¶ 37. Multiple members of Shaw's team have already followed him to Sunrun. *See id.*

### D.    Vivint Refuses To Sell Sunrun Its Solar Leads And Sunrun Continues Its Raid

On December 14, 2023, roughly a week before Vivint learned of Shaw's disloyalty, Sunrun and Vivint executives met to discuss the future of the companies' commercial relationship. *See* E.P. Dec. ¶¶ 30-31. For the prior year, Vivint and Sunrun worked together on a pilot program whereby Sunrun would offer customers a promotion to sign up with both Sunrun and Vivint— bundling Vivint Smart Home products with its solar systems and offering the customer free Vivint Smart Home products for three years. *See id.* ¶ 28. In turn, Sunrun paid Vivint for the customers' three-year subscription. *See id.*; E.P. Dec. Ex. 1. ATTORNEY'S EYES ONLY

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* E.P. Dec. ¶ 29.

At the December 2023 meeting, ATTORNEY'S EYES ONLY

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See id.*

Soon thereafter, on January 9, 2024, Rossiter abruptly resigned from Vivint. *See* J.C. Dec.

¶ 39.  Rossiter had been a Vivint employee for over 12 years and was a Partnership Leader within Vivint's sales organization and a manager of a regional sales team of over 200 sales representatives, including 6 regional managers.  *See id.* ¶ 38.  Rossiter pledged to leave Vivint "the right way," *id.* ¶ 39, but it is now clear that Rossiter's departure, like Shaw's, had long been planned and was part of Sunrun's ongoing raid of Vivint and its plan to steal information for which it had refused to pay. Indeed, it appears that Rossiter's history with Sunrun dates back to no later than Fall 2023.  For example, although Rossiter habitually signed his employment agreements for the upcoming sales season in November or early December, he purposely avoided signing his 2023-2024 contract while taking affirmative steps as early as November 2023 to suggest to Vivint that he was intending to sign. *See id.* ¶ 21; J.C. Dec. Ex. 17.  And two of Rossiter's top-producing direct reports— Defendants Andersen and Lords—both resigned the day after Rossiter's resignation, demonstrating that this was a coordinated effort.  *See* J.C. Dec. ¶¶ 42, 44.  Further, just days before Rossiter's resignation, he obtained for one of his downline sales representatives copies of one of that representative's RSU Agreement.  *See id.* ¶ 40.  The timing of these resignations—in the week leading up to a holiday weekend, when Defendants knew Vivint's ability to respond would be hampered by the holiday—further demonstrates this coordination.

It is now clear that Defendants have worked and are still working to recruit as many Vivint sales representatives and managers from Rossiter's team as they can.  Andersen was a Regional Manager at Vivint, with over 100 sales representatives in his downline, and the leader of the top-producing "Meraki" team.  *See id.* ¶ 41.  Lords was a Manager at Vivint, and one of the top solar producers.  *See id.* ¶ 43.  Each of the Individual Defendants is among Vivint's most experienced sales representatives; by targeting them, Sunrun has been able to successfully solicit many lower-level sales representatives within their downlines to leave for Sunrun.  *See id.* ¶¶ 45-48.  To date,

at least 60 Vivint employees have left with the Individual Defendants.  *See id.* ¶ 60.  Despite Rossiter's pledge to leave the "right way," these employees have not even informed Vivint of their departure.  Vivint has learned about the departures from social media, forcing Vivint to scramble to understand who has left.  *See id.* ¶ 45.

Defendants are also using social media to further their solicitation.  For example, on or about January 14, 2024, the "Meraki" sales team's Instagram account, which on information and belief is run by Andersen, posted an image promoting Sunrun which read: "Meraki Let's Run it. Sunrun."  Declaration of Stephen Wood (Feb. 6, 2024) ("S.W. Dec.") Exs. 20A-26.  The post continued:

> We have had an amazing time at Vivint and will never forget the people who made the time we spent there so amazing. ***We have grown into one of the most powerful sales forces in the industry, and couldn't have done any of it without the support and the systems within Vivint***.
>
> We are so ***excited to announce that the meraki squad will be putting our efforts into dominating at Sun Run***.

S.W. Dec. Ex. 20B (emphasis added).  Andersen also reposted this image on his account. *See* S.W. Dec. Ex. 27.

Since the holiday weekend, members of the Individual Defendant's downlines have posted that the "transfer portal" was open—likening their departures to the NCAA transfer portal through which athletes leave their colleges after being recruited to new schools.  *See, e.g.*, S.W. Dec. Ex. 37. These posts generally credit Vivint support for the employee's sales success, while announcing they were now moving to Sunrun to stay with their "team."  *See, e.g.*, S.W. Dec. Exs. 5, 9-11, 13, 16, 17, 19.  Sunrun is actively assisting in the preparation of these solicitation social media posts at Sunrun's own Utah headquarters.  For example, a January 14 Meraki post promoted by Andersen uses the "Sunrun" logo and appears to show the Meraki team, including Andersen, in Sunrun's Utah facility.  S.W. Dec. Exs. 20A-26.  Similarly, on January 11, former Vivint sales

representative Keonte Williams posted a reel showing behind the scenes shooting at Sunrun's facilities. *See* S.W. Dec. Ex. 34. On January 23, former sales representative Chaz Romney posted a professionally produced Instagram video of him wearing Sunrun gear inside Sunrun's Utah headquarters in Lehi. *See* S.W. Dec. Ex. 29; *id.* (0:06).

Social media activity confirms the raid is ongoing: As recently as ***February 4, 2024***, former sales representative Brandon Reeves posted, "We RUNNIN!!!!! Enough talking, we about to throw down. ***Missing about 1/4 of our people! But they'll be here soon!***" (emphasis added). S.W. Dec. Ex. 35. He tagged Sunrun, Rossiter, and the former Vivint sales teams Meraki and Kefi, demonstrating the ongoing nature of the raid. *See id.*

Sunrun has also solicited multiple Vivint sales representatives directly. *See* J.C. Dec. ¶¶ 51-56. During these conversations, Sunrun has used confidential Vivint compensation information, which is closely guarded even within Vivint and would only be known to senior Vivint sales representatives. *See id.* ¶ 54; R.G. Dec. ¶ 48. The only way that Sunrun would have this information is through the Individual Defendants and other poached Vivint personnel, and Sunrun is using it to target additional members of Vivint's sales force. *See* J.C. Dec. ¶ 54. Sunrun has also falsely told Vivint sales reps that certain influential Vivint sales leaders are coming to Sunrun, when in reality those sales leaders remain at Vivint. *See id.* ¶ 56.

### E.   Before Leaving, The Individual Defendants And Others Accessed Vivint's Trade Secrets

Prior to leaving, the Individual Defendants and others continued to access Vivint's trade secrets and other confidential information. For example, shortly before he left, Andersen sought and received access to Vivint's sales training videos, *see* R.G. Dec. ¶ 63, for which he had no obvious need at that time given that the sales season had recently ended. It is now clear that his request was for the improper purpose of providing the confidential and proprietary Vivint training

materials to Sunrun.  In addition, at least eight of the now-departed employees who have left for Sunrun but did not inform Vivint of their resignations accessed Vivint's confidential information technology systems after they appear to have left for Sunrun.  *See id.* ¶¶ 57-62.  The systems accessed contain, amongst other things, Vivint's trade secret customer information, employee compensation information, and solar customer leads—and are secured through credentials, password protection, and two-factor authentication, among other measures.  *See id.* ¶¶ 23-52. Vivint is continuing to learn more information about the departing employees, and it is likely that many more of the poached representatives have retained information about customers and leads from Vivint, which they intend to use at Sunrun.

**F.**     **The Impact Of Sunrun's Raid On Vivint**

Vivint already has lost over sixty of its sales representatives as a result of Sunrun's ongoing raid.  *See* J.C. Dec. ¶ 60.  By targeting many of Vivint's most experienced sales leaders, Sunrun has caused lower-level individuals in those leaders' downlines to join Sunrun as well.  *See id.* ¶ 48. Vivint expends substantial resources training its sales teams, and experienced Vivint sales leaders—such as the Individual Defendants—are incentivized to build large downlines over multiple seasons.  *See id.* ¶¶ 13-17, 25; C.G. Dec. ¶¶ 53-60.  ATTORNEY'S EYES ONLY ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* E.P. Dec. ¶ 38.  The departures of the Individual Defendants and of members within their downlines will materially impact Vivint's solar sales and threaten Vivint's ability to be ready for the next sales season, which in turn will diminish Vivint's exposure in the marketplace and customer goodwill.  *See id.* ¶¶ 37-43; C.G. Dec. ¶¶ 67-72.  Vivint will lose not only new customer relationships, but also the opportunity to build longer-lasting and deeper relationships with its existing customers, who would otherwise add a Vivint solar system to their Vivint system and then, potentially, additional Vivint Smart Home products.  *See* E.P. Dec. ¶ 40;

C.G. Dec. ¶¶ 67-72.  The raid on Vivint's sales force has also had other impacts: doubtless in reaction to the public information about Sunrun's raid, one of Vivint's installation partners is now trying to negotiate lower commission rates for solar systems due to the departures.  *See* E.P. Dec. ¶ 43; *see also* C.G. Dec. ¶¶ 75.  In short, the harm to Vivint is substantial and cannot be fully predicted, especially given that Defendants' conduct is ongoing.

## ARGUMENT

### I.   LEGAL STANDARD

To obtain a preliminary injunction, the movant must establish: "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016).[1]  In establishing a likelihood of success, the movant "must present a prima facie case but need not show a certainty of winning."  *Id.* (noting that "[a]ll courts agree" on this point).

### II.   VIVINT WILL LIKELY SUCCEED ON THE MERITS OF ITS CLAIMS[2]

#### A.   Vivint Is Likely To Prevail On Its Breach Of Contract Claims

To establish a prima facie case of breach of contract under Utah law, a plaintiff must show, "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."  *Lifevantage Corp. v. Domingo*, 208 F. Supp. 3d 1202, 1214 (D. Utah 2016) (Parrish, J.).  Delaware law is similar.[3]  In exchange for access to Vivint's resources

---

[1]  Unless otherwise noted, all internal citations and quotations are omitted and all emphases added.

[2]  A "plaintiff need only establish a likelihood of success on the merits of one of [its] claims." *George v. Davis Sch. Dist.*, 2023 WL 5000989, at *6 (D. Utah Aug. 4, 2023) (unpub.) (Parrish, J.).

[3]  Utah law governs the Employment Agreements.  Delaware law, which governs the RSU Agreements, does not include the element of plaintiff's performance.  *See also Elkay Interior Sys. Int'l, Inc. v. Weiss*, 2022 WL 17961568, at *2 (D. Del. Dec. 27, 2022) (unpub.) ("plaintiff must

and millions in consideration, the Individual Defendants signed agreements containing non-disclosure obligations and enforceable restrictive covenants, which they have repeatedly violated.

1.   The Restrictive Covenants Are Valid And Enforceable.

Under both Utah and Delaware law, courts examining the enforceability of restrictive covenants examine the scope of the covenant in the context of the seniority of and consideration granted to the employee. *See Prop. Mgmt. Bus. Sols. v. Averitte*, 2018 WL 4327922, at *5 (D. Utah Sept. 10, 2018) (unpub.) (analyzing reasonableness of restrictive covenants based on, in part, the "nature of the employee's duties" and "consideration" the employee received); *Ash Cap. v. Jensen*, 2011 WL 12454666, at *5 (Utah Dist. Ct. Sept. 2, 2011) (unpub.) (restrictive covenant is reasonable based on former employee's "substantial" compensation and role, and because "the distributor chain in 'downlines' are the lifeblood" of the industry); *Kasco Servs. Corp. v. Benson*, 831 P.2d 86, 87 (Utah 1992) (enforcing restrictive covenant where former employee was a "top five salespersons"); *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (unpub.) (restrictive covenant reasonable based on "competitive nature of the industry and the depth of [defendant]'s knowledge of [plaintiff]'s business practices"); *TP Group-CI, Inc. v. Vetecnik*, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) (unpub.) (restrictive covenants enforceable where defendant "received consideration in the form of valuable stock options"). Here, there can be no question that the Individual Defendants' restrictive covenants are enforceable.

As noted above, each of the Individual Defendants' Employment Agreements contains 18-

plead facts plausibly suggesting (1) the existence of a contract, (2) the breach of an obligation imposed by that contract, and (3) resulting damage").

month non-solicits.[4]  Each of the Individual Defendants were senior managerial employees with

substantial numbers of direct reports and access to confidential company information, and each

was highly paid: ████████ATTORNEY'S EYES ONLY████████

████████████████████████████████████

████████████████.  *See* J.C. Dec. ¶ 24.  Each of the Individual Defendants also

received sizable equity grants pursuant to RSU Agreements, which contain 12-month non-solicits

and non-competes.  *See* J.C. Dec. Exs. 5-8, 10-13, App'x A, ¶¶ 1(a)(i)-(iii).  The RSU Agreement

non-competes apply only to employment for an enumerated set of Core Competitors, including

Sunrun.  *See* J.C. Dec. Exs. 5-8, 10-13, App'x A, ¶¶ 1(a)(v)(B).

Under Utah law, the 18-month non-solicitation provisions are reasonable, particularly in

light of the Individual Defendants' seniority and compensation.  *See, e.g.*, *Averitte*, 2018 WL

4327922, at *5 (enforcing two-year non-compete and non-solicit); *Bad Ass Coffee Co. of Hawaii

v. JH Nterprises, L.L.C.*, 636 F. Supp. 2d 1237, 1253 (D. Utah 2009) (enforcing two-year customer

non-solicitation provision); *Kasco*, 831 P.2d at 88 (enforcing, during the pendency of appeal, an

18-month non-solicitation of customers); *see also Route App, Inc. v. Heuberger*, 2023 WL

5334192, at *3-5 (D. Utah Aug. 18, 2023) (unpub.) (applying Delaware law and denying motion

to dismiss claims based on two-year, worldwide non-compete and non-solicit provisions tailored

to specific competitors); *TP Group.-CI*, 2016 WL 5864030, at *2 (noting "Delaware courts have

routinely found restrictive covenants with a duration of two years to be reasonable in duration"

and finding non-compete was "reasonable in geographic scope because the restriction is limited to

---

[4]  As noted above, each of the Individual Defendants signed the 2023-2024 Employment Agreement, J.C. Dec. Exs. 2-4, except Rossiter, who, after expressing his intent to sign one, delayed until he left Vivint, J.C. Dec. ¶ 21.  However, Rossiter signed a 2022-2023 Employment Agreement, which contain the same restrictive covenants, which expire in 2025.  J.C. Dec. Ex. 1.

Plaintiff's competitive market").

      2.      The Individual Defendants Breached The Restrictive Covenants.

Each of the Individual Defendants left Vivint no earlier than December 2023, and all are currently working for "Core Competitor" Sunrun. *See supra* pp. 5-7; J.C. Dec. Exs. ¶ 5-8, 10-13 at App'x A, ¶ (1)(a)(v)(B). Accordingly, each Individual Defendant has breached his non-complete obligation. *See Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *15 (Del. Ch. Jan. 17, 2007) (unpub.) (likelihood of success where defendant "went to work directly for a competitor").

In addition, the Individual Defendants have breached their non-solicit obligations. For example, Shaw duped Vivint into paying for his downline to go on a supposed sales "blitz" but instead took them to meet with Sunrun executives at Sunrun's headquarters. And, following Rossiter's abrupt resignation, Lords and Andersen, two of Rossiter's top-producing direct reports, resigned the very next day. *See supra* pp. 5-7. Members of Lords' and Andersen's downlines immediately followed and began posting group photos on social media—including with Andersen—touting Sunrun. *See supra* pp. 7-9. Utah and Delaware courts have found this exact type of behavior to constitute a breach of non-solicitation provisions. *See, e.g.*, *SecurityNational Mortg. Co. v. Chavez*, 2017 WL 3834745, at *2 (D. Utah Aug. 31, 2017) (unpub.) (granting temporary restraining order where multiple employees abruptly left while under supervision of individual defendant, finding defendant "solicited at least two, and possibly up to five [plaintiff] employees" after three such employees joined defendant at new employer); *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, 2016 WL 6091540, at *13 (D. Utah Oct. 18, 2016), *aff'd sub nom.* 906 F.3d 884 (10th Cir. 2018) (unpub.) (finding breach of non-solicitation provision where individual defendants had directed "numerous employees" towards employer defendant and 26 of plaintiff's former employees now work for employer defendant); *Neways Inc. v. Mower*, 543 F. Supp. 2d 1277, 1286-7 (D. Utah 2008) (finding substantial likelihood of success on merits that

defendants breached non-solicitation agreement where defendants met with plaintiff's salespeople to give them information about competitor and when a "substantial number" of downline distributors came from plaintiff); *Bakotic v. Bako Pathology LP*, 2018 WL 6601172, at *3 (Del. Super. Ct. Dec. 10, 2018) (unpub.) ("[Counterclaim defendants] likely recruited [] individuals in breach of their non-solicitation covenants" where "[a]t least one former employee" left for competitor).

3.    <u>The Individual Defendants Breached Their Confidentiality Obligations.</u>

Each of the Individual Defendants' Employment and RSU Agreements contains confidentiality obligations. Before leaving Vivint, the Individual Defendants accessed and misused Vivint's confidential information in breach of these confidentiality obligations. *See ClearOne Commc'ns, Inc. v. Chiang*, 2007 WL 3231524, at *2 (D. Utah Oct. 30, 2007), *modified*, 2009 WL 273325 (D. Utah Feb. 4, 2009) (unpub.) (likelihood of success where former employee took plaintiff's confidential information, even if he did not use it); *TP Group.-CI, Inc.*, 2016 WL 5864030, at *2 (likelihood of success where defendant took new techniques developed under plaintiff's employ). For example, Sunrun has made statements to Vivint employees about their compensation, which is information to which only high-ranking sales personnel such as the Individual Defendants would have had access. *See* J.C. Dec. ¶ 54. Defendants are also targeting top-performing salespeople, again based on confidential information. *See id*. Defendant Andersen requested and received access to all of Vivint's sales training videos for no discernable business purpose. *See* R.G. Dec. ¶ 63. At least eight other Vivint salespeople accessed Vivint's systems, including highly confidential and trade secret customer information, after having apparently joined Sunrun. *See id*. ¶¶ 57-62. Because the Individual Defendants misused and retained confidential information, they breached the non-disclosure provisions of their contracts with Vivint.

16

**B.      Vivint Is Likely To Prevail On Its Tortious Interference Claim**

Vivint is also likely to prevail on its tortious interference claim against Sunrun because Vivint is likely to establish: (1) Sunrun intentionally interfered with Vivint's existing economic relations; (2) by improper means; (3) causing injury to Vivint.  *SME Steel Contractors, Inc. v. Seismic Bracing Co., LLC*, -- F. Supp. 3d --, 2023 WL 4463246, at *29 (D. Utah July 11, 2023); *Ivanti, Inc. v. StayLinked Corp.*, 2019 WL 4645325, at *3 (D. Utah Sept. 24, 2019) (unpub.) (inducement of breaches of restrictive covenants, including use of deception and violations of industry norms, constituted tortious inference with economic relations).

*First*, Vivint has contractual agreements with its employees and former employees, including the Individual Defendants, which contain valid non-competition, non-solicitation, and non-disclosure provisions.  *See supra* Sect. II.A.(i).

*Second*, Sunrun's raid of Vivint's employees constitutes improper means.  Under Utah law, the element of "improper means" is the "'the functional equivalent' of unexcused or unjustified [means]," which may include "the violation of an established standard of a trade or profession."  *In re Smith*, 618 B.R. 901, 923 n. 138 (Bankr. App. 10th Cir. 2020); *C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 346-47 (Utah 2019).  Here, non-competition and non-solicitation agreements for sales representatives are standard in the solar industry and Sunrun itself uses restrictive covenants with its own sales representatives.  *See* J.C. Dec. ¶ 49-50.  Utah courts have consistently found that "predatory hiring practices" that violate an established standard of a trade or profession with respect to use of restrictive covenants constitutes improper means.  *See, e.g. Vendr, Inc. v. Tropic Techs., Inc.*, 2023 WL 8789297, at *5-6 (D. Utah Dec. 19, 2023) (unpub.), (finding "intentional scheme by [a company defendant] to recruit multiple [plaintiff's] employees . . . and to induce those employees to violate their contractual obligations" satisfied the element of improper means because the defendant's conduct was "outside the industry norm."); *Ivanti, Inc.*, 2019 WL 4645325,

at *3 (hiring people with restrictive covenants was improper means and "violated industry standards of non-competition and confidentiality" for competitive advantage). This is particularly so given that Sunrun recruited the Individual Defendants with full knowledge of their restrictive covenants. *See Vendr, Inc.*, 2023 WL 8789297, at *6 (improper means when the defendant knew of plaintiff's restrictive covenants and used similar with own employees); J.C. Dec. ¶ 49-50.

Here, Sunrun's predatory behavior has gone several steps further. For example, Sunrun SVP Williams counseled Shaw to quickly establish residency in California in an attempt to evade Shaw's contractual obligations, and offered to pay for Shaw's legal fees. *See* J.C. Dec. ¶ 31. And Sunrun executives met with Shaw's downline, in an attempt to recruit them, during a trip paid for by Vivint and while Shaw was still employed at Vivint. *See id.* ¶¶ 34-6. Sunrun has also misrepresented to Vivint sales representatives that other Vivint salespeople would be departing for Sunrun, when in fact they were not. *See id.* ¶ 56. These deceits further constitute improper means. *See Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 2023 WL 4238454, at *12 (D. Utah June 28, 2023) (unpub.) ("deceit or misrepresentation" is "improper means" and defendant's "false statements" evince "independently tortious or wrongful" conduct). And Sunrun's blatant behavior is ongoing. Sunrun has continued to assist the Individual Defendants in their prohibited solicitation efforts, including by providing production facilities and assistance for the solicitation videos posted by departing Vivint employees. *See* S.W. Dec. Exs. 20A-34.

*Third*, Sunrun's behavior has and is indisputably damaging Vivint. *See infra* Sect. III.

## C.     Defendants Misappropriated Vivint's Trade Secrets

To prevail on its UTSA and DTSA trade secret claims,[5] Vivint must show: "(1) the

---

[5] "The elements of a trade secret claim under the UTSA closely resemble those of a claim under the DTSA." *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, 2020 WL 6940736, at *21 (D. Utah Nov. 25, 2020) (analyzing claims together) (unpub.).

existence of a trade secret[]; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Total Quality Sys.*, 2023 WL 4238454, at *6.  "A prima facie case of misappropriation is established on the basis of two essential elements: existence of a protectable 'trade secret' of a plaintiff and demonstration of 'misappropriation' by a defendant." *InnoSys, Inc. v. Mercer*, 364 P.3d 1013, 1018 (Utah 2015).

1.   Existence Of A Trade Secret

A "trade secret" is any information that (a) "derives independent economic value," "actual or potential," from not being generally known or readily ascertainable to others; and (b) "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Applied Predictive Techs.*, 2020 WL 6940736, at *21.  That information can include a "compilation" of data—including data in the public domain—through which an owner has achieved an "effective, successful and valuable integration" "such that the owner derives a competitive advantage from it." *USA Power, LLC v. PacifiCorp*, 235 P.3d 749, 759 (Utah 2010).

Here, Vivint's customer lists, solar leads, compensation information, trainings, and sales metrics satisfy both definitional requirements.  *See, e.g.*, *Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, 2016 WL 6916539, at *9 (D. Utah Sept. 28, 2016) (unpub.) ("[C]ustomer lists" are among the "types of information regularly protected as trade secrets."); *Mountain Am. Credit Union v. Godfrey*, 2006 WL 2129465, at *2 (D. Utah July 28, 2006) (unpub.) (similar); *Graystone Funding Co., LLC v. Network Funding, L.P.*, 2021 WL 4460113, at *5 (D. Utah Sept. 29, 2021) (unpub.) ("employee compensation and benefit information" protected); *Farm Bureau Life Ins. Co. v. Am. Nat. Ins. Co.*, 505 F. Supp. 2d 1178, 1185-86 (D. Utah 2007) (customer lists and compensation information protected); *Henry Coffeen III Mgmt., Inc. v. Branch*, 2017 WL

19

4271423, at *8 (D.N.M. Sept. 25, 2017) (unpub.) ("training programs and manuals" qualify as trade secrets).

Independent Economic Value. Vivint's trade secrets derive significant actual and potential economic value from not being readily available or generally known to competitors like Sunrun. For example, Vivint's trade secrets include non-public information about the compensation Vivint sales representatives receive, which a competitor could use—and which Sunrun is already trying to use—to poach Vivint sales leaders. *See* J.C. Dec. ¶ 54. Vivint's trade secrets also include confidential and proprietary information about potential customer leads for solar products that are developed by Vivint and accessible only by Vivint employees through Vivint systems. *See* E.P. Dec. ¶¶ 8-14; R.G. Dec. ¶¶ 23-39, 49-52. This information—which is **not** publicly available— allows Vivint to target those customers who are particularly likely to buy their solar offerings, allowing their sales representatives to focus their sales efforts much more efficiently, at lower cost, and providing Vivint an advantage over its competitors (including Sunrun). *See* E.P. Dec. ¶¶ 8-14. It also derives value from being sought after by, and marketable to, Vivint's competitors; indeed, ATTORNEY'S EYES ONLY . *See id.* ¶¶ 30-1. These trade secrets took Vivint years and significant resources, money, and time to develop. *See id.* ¶ 14; *see also* J.C. Dec. ¶¶ 6-17.

Reasonable Protective Measures. Vivint takes extensive steps to protect its trade secrets from disclosure. Vivint requires employees with access to its trade secrets, including each of the Individual Defendants, to sign non-disclosure agreements covering the information at issue. *See* J.C. Dec. ¶ 25. Vivint also implements other security measures to guard against unauthorized access, including housing its customer and compensation information in password-protected systems which require multi-factor authentication to access, and restricting access within these

20

systems on a "need-to-know" basis. *See, e.g.*, R.G. Dec. ¶ 5. These were reasonable measures to protect Vivint's trade secrets. *See, e.g.*, *Total Quality Sys.*, 2023 WL 4238454, at *6-7 (reasonable measures included non-disclosure agreement and password protection"); *Advanced Recovery Sys.*, 2016 WL 6916539, at *9 (confidentiality agreements constituted reasonable protective measures); *Farm Bureau Life Ins. Co.*, 505 F. Supp. 2d at 1185-86 (same).

        2.   <u>Misappropriation</u>

      While at Vivint, each of the Individual Defendants had access to Vivint's confidential, trade secret information, through multiple Vivint tools and systems. *See* R.G. Dec. ¶¶ 3-4. Shortly before leaving, the Individual Defendants continued to access that information, as did multiple other now-departed employees, including after announcing on social media that they were leaving for Sunrun but *before* informing Vivint of their resignations. *See id.* ¶¶ 57-63. And, because some Vivint sales representatives use their personal devices to communicate with customers, departing representatives may have stored some of this information. *See* J.C. Dec. ¶ 18; *see also* R.G. Dec. ¶ 56 (discussing security measures Vivint requires on personal devices). There is every reason to believe that Sunrun has recruited these employees at least in part to benefit from the solar leads that the Individual Defendants and other employees had access to. And Sunrun is already using Vivint's confidential compensation information in order to target sales reps for recruitment. *See* J.C. Dec. ¶ 54. It is highly likely it will similarly use customer information departing sales reps bring to it. There is an amply sufficient basis for an injunction to issue here. *See* Utah Code Ann. § 13-24-3(1) (authorizing plaintiff to seek an injunction based on *"**threatened** misappropriation"*); 18 U.S.C. § 1836(b)(3)(A)(1) (same); *see also PacifiCorp*, 235 P.3d at 761 (jury can infer misappropriation based on circumstantial evidence).

## III.   VIVINT HAS SHOWN IRREPARABLE HARM

      Vivint has suffered, and will continue to suffer, irreparable harm as a result of Defendants'

wrongful conduct. "A plaintiff satisfies the irreparable harm requirement by demonstrating a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Averitte*, 2018 WL 4327922, at *7.  Irreparable harm may be based on such factors as "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, … and lost opportunities to distribute unique products." *Core Progression Franchise LLC v. O'Hare*, 2022 WL 1741836, at *3 (10th Cir. May 31, 2022) (unpub.) (quoting *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004)).  Where a "[restrictive covenant] is breached, the injured party will often seek an injunction to prevent irreparable harm…[and] such a remedy is appropriate." *TruGreen Cos. v. Mower Bros., Inc.*, 199 P.3d 929, 932 (Utah 2008); *see also Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (citing Restatement (Second) of Contracts § 360(a) & cmt. b (Am. Law Inst. 1981) ("The breach of a covenant not to compete may cause the loss of customers of an unascertainable number or importance.")).

Numerous courts have recognized that breaches of employees' restrictive covenants, and improper recruiting activities by a competitor to disrupt a plaintiff's salesforce and induce them to violate their contracts and use their employer's confidential information, threaten irreparable harm justifying injunctive relief. *See, e.g.*, *Sys. Concepts, Inc. v. Dixon*, 669 P.2d 421, 428 (Utah 1983) (finding irreparable harm where defendant was a "national sales manager," was "knowledgeable and familiar with [plaintiff's] products, sales methods and customers," and had "access to proprietary information;" new employer was "direct competitor;" and defendant would be in same role with "same duties" at new employer and would contact the "same customers" as at plaintiff). Irreparable harm is particularly likely in an industry using direct sales and downline commissions, because the sales force is crucial and not easily replaceable. *See Agel Enters., LLC v. Schroeder*,

2008 WL 4753727, at *1 (D. Utah Oct. 28, 2008) (unpub.) ("the threat of continued loss of distributors represented irreparable harm").

Here, the Employment Agreements contain language expressly acknowledging that "any breach" of the restrictive covenants, including the non-solicitation and confidentiality provisions, "will cause SHP immediate and irreparable harm and entitle SHP to injunctive relief[.]" J.C. Dec. Exs. 1-4, ¶ 18(f). Such language weighs in favor of finding irreparable harm. *See Bad Ass Coffee Co.*, 636 F. Supp. 2d at 1248 (finding it "significant" that "the [a]greement specifically states that a breach of the non-competition provisions will irreparably harm [plaintiff]").[6] Additionally, the threat of loss of Vivint's solar leads and other confidential trade secrets constitutes irreparable harm. *See Paparazzi, LLC v. Sorenson*, 2022 WL 1606559, at *3 (D. Utah May 20, 2022) (unpub.) ("Once distributed, confidential information is very hard to protect and recover.").

Those facts are sufficient to establish irreparable harm, but Sunrun has also targeted many of the most experienced Vivint sales leaders, which in turn has caused lower-level individuals in those leaders' downlines to move as well. *See supra* pp. 5-7. Vivint expends substantial resources training its sales teams up front, and experienced Vivint sales leaders—like the Individual Defendants—are incentivized to build downlines of successful salespeople as they work over multiple seasons. *See supra* pp. 3-4; C.G. Dec. ¶¶ 73-74. The loss of key members of Vivint's sales force to Sunrun, who together have already and are continuing to bring along with them members of their downlines, is irreparable, as is the resulting loss of Vivint's customer relationships. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191-92 (10th Cir. 2009) (noting that where "the business at issue 'is based on personal contacts and a knowledge of the

---

[6] The RSU Agreements contain similar language, *see* J.C. Dec. Exs. 5-8, 10-13, ¶ 15(a), and the same is true under Delaware law. *See, e.g.*, *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *21 (Del. Ch. June 20, 2019) (unpub.).

special needs and requirements of customers, [that] fact . . . complicates any damage estimate'");

*DP Creations, LLC v. Reborn Baby Mart*, 2022 WL 3108232, at *8 (D. Utah Aug. 3, 2022) (unpub.)

("[I]t is impossible to calculate the value of the loss of customers and goodwill.").  Particularly

here, Vivint has lost the unquantifiable opportunity to build longer lasting and deeper relationships

with customers that may have added on additional solar or Smart Home products in the future.  *See*

E.P. Dec. ¶ 40; C.G. Dec. ¶¶ 67-72.  Additionally, Vivint's relationships with solar installers (and

the commissions they pay) are also threatened—already, one of Vivint's installers has sought to

re-negotiate its agreements due to Defendants' misconduct.  *See* E.P. Dec. ¶ 43; C.G. Dec. ¶ 75.

## IV.    A BALANCING OF THE EQUITIES WEIGHS IN FAVOR OF AN INJUNCTION

Vivint's "threatened injury outweighs the injury [Defendants] will suffer under the

injunction."  *O'Hare*, 2022 WL 1741836, at *3.  "[W]hen a party knowingly takes actions that

increase the potential for harm if an injunction is ordered against them, courts give those harms

little weight in the balancing test."  *Bad Ass Coffee Co.*, 636 F. Supp. 2d at 1251.  Here, Defendants

put themselves in this position by "knowingly tak[ing] actions" to violate their contractual

obligations, or by conspiring and aiding and abetting such violations.  *Id.*  Defendants' harms are

"self-inflicted" and therefore deserve little consideration.  *Davis v. Mineta*, 302 F.3d 1104, 1116

(10th Cir. 2002), *abrogated on other grounds by Audubon Soc'y of Greater Denver v. U.S. Army

Corps of Eng'rs*, 908 F.3d 593 (2018).  The equities thus favor Vivint.  *See also O'Hare*, 2022

WL 1741836, at *4 (affirming finding that loss of trade secrets outweighed ability to participate

in chosen profession).

## V.    AN INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST

The requested preliminary injunction promotes the public interest as to both the

enforcement of contracts and the encouragement of fair competition.  "The public has a strong

interest in the enforcement of valid contracts, including reasonable and enforceable noncompete

provisions." *Averitte*, 2018 WL 4327922, at *8; *see also O'Hare*, 2022 WL 1741836, at *4 ("[P]romptly enforced noncompete agreements are in the public interest."). The public interest is also served by enjoining misappropriation of trade secrets. *See Cordell v. Berger*, 2001 WL 1516742, at *5 (D. Utah Nov. 27, 2001) (unpub.) ("[T]rade secret law furthers competition by encouraging … development.").

## VI.   IN THE ALTERNATIVE, EXPEDITED DISCOVERY IS APPROPRIATE

For the reasons above, Vivint has demonstrated that a preliminary injunction should issue. However, should the Court disagree, Vivint respectfully requests that the Court permit it to engage in limited, targeted expedited discovery, including of (i) communications between the Individual Defendants and Sunrun concerning Vivint; (ii) documents and communications concerning any efforts by Sunrun or the Individual Defendants to recruit Vivint sales representatives (including the Individual Defendants); and (iii) documents and communications related to the Individual Defendants' access to and possession, use, or disclosure of Vivint's confidential information, and Sunrun's use of and access to the same. Good cause for such discovery exists because Vivint seeks this discovery in aid of a preliminary injunction. *See, e.g.*, *Am. Equip. Sys. v. Chester*, 2023 WL 8261427, at *3 (D. Utah Nov. 29, 2023) (unpub.); *DP Creations, LLC v. Reborn Baby Mart*, 2021 WL 11585915, at *7 (D. Utah Nov. 22, 2021) (unpub.). The rapid, synchronized timing of the Individual Defendants' and their downline reports' departures, coupled with the coordinated group photos on social media, *see* S.W. Dec. Exs. 1-27, strongly suggests relevant communications exist. The requested discovery is narrowly tailored, with a clear purpose, and will not impose an undue burden on Defendants. *Chester*, 2023 WL 8261427, at *2-5 (granting expedited discovery)

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs respectfully requests the Court issue a preliminary injunction consistent with Plaintiffs' proposed order.

DATED this 6th day of February, 2024.

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

*/s/ Stephen Q. Wood*
Rachel E. Epstein (*pro hac vice application pending*)
Stephen Q. Wood (12403)
Quinn Emanuel Urquhart & Sullivan, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
Telephone: (801) 515-7300
Facsimile: (801) 515-7400
rachelepstein@quinnemanuel.com
stephenwood@quinnemanuel.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of February, 2024, I filed with the Clerk of Court a true and correct copy of the foregoing **MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR (1) PRELIMINARY INJUNCTION AND, (2) IN THE ALTERNATIVE, EXPEDITED DISCOVERY DECLARATIONS** via the CM/ECF System which sent notification to:

Peggy A. Tomsic
Geoffrey K. Biehn
Magleby Cataxinos & Greenwood
141 W. Pierpont Avenue
Salt Lake City, UT 84101-3605
tomsic@mcg.law
biehn@mcg.law

*Attorneys for Defendants Sunrun, Inc.,*
*Bradley Rossiter, and Jaycen Shaw*

/s/ Lisa Hewitson
_____

27