IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| VIVINT, INC., VIVINT SMART HOME, INC., and SMART HOME PROS, INC., <br><br>Plaintiffs, <br><br>v. <br><br>SUNRUN, INC., BRADLEY ROSSITER, ZACHARY ANDERSEN, NATHAN LORDS, and JAYCEN SHAW, <br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION <br><br><br>Case No. 2:24-cv-00034-JNP-DBP <br><br>District Judge Jill N. Parrish |

Plaintiffs Vivint, Inc., Vivint Smart Home, Inc., and Smart Home Pros, Inc. (collectively, Vivint) sued four former employees and their new employer, Sunrun, Inc. Vivint alleged that the employees breached non-compete, non-solicitation, and non-disclosure clauses found in contracts that they had executed. Vivint also claimed that Sunrun had tortiously interfered with its contractual relations with its former employees and that the former employees and Sunrun had misappropriated its trade secrets.

Before the court is a motion for a preliminary injunction filed by Vivint. ECF No. 23. It requests an injunction prohibiting the former employees from further violating their contractual duties and prohibiting them from further misappropriation of trade secrets. Vivint also asks the court to enjoin Sunrun from interfering with its contracts with the former employees and from using or further misappropriating trade secrets. The court DENIES Vivint's motion.

## FINDINGS OF FACT[1]

Vivint sells home security and home automation systems to consumers through door-to-door sales. Vivint employees also sell solar energy systems to homeowners on behalf of third-party installers, who pay Vivint a commission for each sale. Sunrun both sells solar energy systems to residential homeowners through door-to-door sales and installs the systems. Vivint and Sunrun are simultaneously partners and competitors in the solar sales industry. In some markets, Vivint employees sell solar energy systems on behalf of Sunrun, which pays Vivint a commission and installs the system. Vivint and Sunrun also directly compete for sales contracts with customers.

Vivint uses a hierarchical pyramid structure for its sales employees. Higher-level employees receive compensation for sales made by employees below them, commonly referred to as their "downline." By the fall of 2023, Bradley Rossiter had achieved the position of Partnership Leader within the Vivint sales structure. He had over 200 sales representatives in his downline, including six Regional Managers. Zachary Andersen reported to Rossiter and was a Regional Manager with over 100 sales representatives in his downline. Nathan Lords also reported to Rossiter and was a Regional Manager. He was one of the top solar sales representatives at Vivint. Jaycen Shaw was a Regional Manager and one of Vivint's top sales leaders.

Vivint requires all of its sales employees to sign annual employment contracts (Employment Agreements). The term of the contract runs from the date it is signed (typically in the fall) until around October 1 of the following year or until the employee or Vivint terminates the agreement by ending the employment relationship, whichever occurs earlier. The Employment

---

[1] The court bases its findings of fact on the declarations and documentary evidence submitted to the court, as well as the live testimony presented during a full-day evidentiary hearing on the preliminary injunction motion.

Agreement contains a non-solicitation provision prohibiting the employee from attempting to influence other Vivint employees to leave their jobs for the term of the contract plus a period of 18 months after the term ends. The Employment Agreement also contains a non-disclosure clause prohibiting employees from disclosing Vivint's confidential information.[2] Rossiter signed an Employment Agreement for the 2022–2023 sales season, which terminated around October 1, 2023. He did not sign an employment agreement for the 2023–2024 sales season. Andersen, Lords, and Shaw signed employment agreements for the 2023–2024 sales season.

In 2022, Vivint also gave Rossiter, Andersen, Lords, and Shaw the opportunity to receive stock in Vivint Smart Home, Inc. In order to receive the stock, the individual defendants had to log into a portal maintained by Morgan Stanly, which administrated Vivint's stock incentive program, and accept the terms of a Restricted Stock Unit Grant Notice for a time-based award of stock (Time-Based Grant Notice) and the terms of a Restricted Stock Unit Grant Notice for a performance-based award of stock (Performance-Based Grant Notice). The individual defendants manifested their assent by clicking a box indicating that they had reviewed the contracts and then clicking a button indicating that they accepted the terms of the contracts. Both the Time-Based Grant Notice and the Performance-Based Grant Notice stated that the signatories would be bound by the terms of a separate document entitled "Restricted Stock Unit Agreement" (RSU Agreement).[3] Computer records indicate that the individual defendants accepted their time-based

---

[2] The non-disclosure clause is silent as to the period of this obligation. Accordingly, the restrictions contained in this provision presumably terminate when the term of the contract ends.

[3] Because the Time-Based Grant Notice and the Performance-Based Grant Notice are clickthrough agreements, Vivint presented the declaration of its Director of Equity Compensation, Melissa Bannister, to prove that the individual defendants agreed to the terms of the Grant Notice documents. Bannister states how the portals worked in 2022 and avers that she reviewed computer records indicating the precise time when each defendant agreed the terms of the Grant Notices by

and performance-based stock awards by clicking through the portal between March and September of 2022.

The RSU Agreement contains a non-solicitation clause that precludes the employee from encouraging other Vivint employees to leave Vivint. It also contains a non-compete provision precluding the employee from taking a job with a "core competitor" or any job with another company in which the employee would engage in the "installation or servicing of residential or commercial solar panels or sale of electricity generated by solar panels." The RSU Agreement explicitly defines Sunrun as a core competitor. The non-solicitation and non-compete clauses bound the employee during the term of employment "and for a period of one year following the date [the employee] ceases to be employed by [Vivint]."[4] Finally, The RSU Agreement contains a provision precluding the employee from disclosing confidential information during or any time after the term of employment.

---

clicking the acceptance button. The Bannister declaration avers that the portal required users to open the contract documents associated with any award before clicking the accept button. Bannister does not clarify whether the portal gave the user access to both the Grant Notice and the accompanying RSU Agreement before permitting the user to accept the terms of these documents by clicking a button or whether the portal opened only the Grant Notice document without giving the user a reasonable opportunity to know the terms of the RSU Agreement before acceding to the terms of that document by agreeing to be bound by the Grant Notice.

[4] The interaction between this language and Vivint's one-year employment contract model for its sales representatives is somewhat ambiguous. As noted above, all sales employees sign one-year Employment Agreements that end around October 1. If the employee does not sign a new contract before the termination date, the employment relationship ends, and Vivint and the employee must come to terms on a new employment contract for the following sales season. It is not entirely clear whether "the date [the employee] ceases to be employed" refers to the termination date under the then current Employment Agreement—i.e., October 1, 2022—or whether this language refers to all future termination dates for all subsequent one-year contracts that the employee may enter into. Because the parties do not raise this issue and because it is not necessary to resolve this question to rule on Vivint's motion for a preliminary injunction, the court does not address this ambiguity in this order.

In 2023, Sunrun began to recruit Vivint's sales employees. In June 2023, for example, Sunrun's Senior Vice President of Sales offered Shaw a substantial salary guaranty to come work for Sunrun. By September 2023, Shaw had decided to leave Vivint for Sunrun and began to recruit salespeople in his downline to leave with him. Sunrun gave Shaw a $1 million budget of incentives that he could offer to Vivint employees to move to Sunrun. With this budget, Shaw began to make offers of cash and Sunrun stock to Vivint employees to incentivize them to accept sales positions at Sunrun.

In November 2023, Shaw convinced Vivint to pay for him and his downline sales team to travel to Southern California for a week-long "blitz" to sell Vivint products. Unbeknown to Vivint, Shaw secretly took members of his sales team to Sunrun's Southern California headquarters so that high-level Sunrun executives could further recruit Vivint's sales employees and discuss their new roles at Sunrun. The Sunrun executives told the Vivint employees to retain Vivint's client information so that they could use it to sell Sunrun's products. The executives also told the Vivint salespeople that they should no longer communicate with Shaw regarding the transition to avoid legal problems and discouraged them from sending any text messages regarding their plans to move to Sunrun. They were told that phone conversations were preferred.

Concerned about the low number of sales from the California blitz trip, Vivint scheduled a meeting with Shaw. At the December 20, 2023 meeting, Shaw told Vivint that he intended to take a job with Sunrun. Vivint fired Shaw. Immediately thereafter, multiple members of Shaw's downline sales team quit and moved to Sunrun.

In December 2023, Rossiter and Andersen met with a Sunrun executive to discuss potentially moving to Sunrun. Andersen asked the executive whether Sunrun would reimburse any incentive payments that would be forfeited by Vivint salespeople if any members of his downline

5

chose to move to Sunrun. Sometime in December 2023, Rossiter and Lords also met with the same Sunrun executive to discuss Lords moving to Sunrun.

Rossiter resigned from Vivint on January 9, 2024 to take a job with Sunrun. By this time, Andersen had also decided to leave for Sunrun. While still employed by Vivint, Andersen arranged for Sunrun to book an Airbnb in Utah so that he would have a place to meet with members of his downline. Andersen asked over 20 of the key members of his Vivint downline sales team, which included his brothers, cousins, and friends that he had worked with for an extended period of time, to come to an important meeting with him at the Airbnb. Under the assumption that Andersen wanted to conduct a Vivint sales planning meeting for the upcoming summer sales season, these key sales team members met with Andersen on January 9, 2024. Andersen also invited everyone else on his sales team that was in Utah to come to a second meeting at the Airbnb held on January 10, 2024. Over 20 individuals attended the second meeting. At the January 9 and January 10 meetings, Andersen announced that he was leaving for Sunrun and extolled the virtues of Sunrun while criticizing Vivint. Andersen held one-on-one meetings with all of his downline salespeople in attendance and answered their questions about Sunrun.

Andersen invited the individuals who had attended the meetings to go to a January 10, 2024 Sunrun recruiting event held at its headquarters in Lehi, Utah. Almost everyone elected to attend. Rossiter spoke briefly at the event and said that he was excited about the opportunities at Sunrun. Most of Andersen's downline who attended the recruiting event chose to take jobs at Sunrun. After the recruiting event, Andersen sent a resignation email to Vivint.

Around this time, Lords had also decided to leave Vivint for Sunrun. On January 10, 2024, he met with four or five other Vivint sales representatives at a Starbucks. At the meeting, Lords encouraged the sales representatives to leave Vivint for Sunrun. He stated that Sunrun had a better

culture and that they would make more money there. After the Starbucks meeting, Lords went to the Sunrun recruiting event held at the Lehi headquarters. After the recruiting event, Lords sent a resignation email to Vivint.

On January 15, 2024, Vivint filed a lawsuit against Sunrun, Rossiter, Andersen, Lords, and Shaw. Anong other claims, Vivint asserted causes of action for breach of contract and misappropriation of trade secrets against the individual defendants. Vivint also asserted claims for tortious interference with contractual relations and misappropriation of trade secrets against Sunrun. By early February, the defendants were aware of the lawsuit and were represented by counsel. On February 6, 2024, Vivint filed a motion for a preliminary injunction based on its breach of contract, tortious interference, and misappropriation claims. Vivint requests a preliminary injunction that (1) prohibits the individual defendants from further breaching their contractual obligations, (2) prohibits Sunrun from continuing to interfere with Vivint's contracts with the individual defendants, and (3) prohibits all of the defendants from using, disclosing, or further misappropriating Vivint's trade secrets.

In March 2024, Lords contacted a Vivint sales representative and offered him a guarantee of $500,000 in commissions if he took a sales job with Sunrun.

On June 21, 2024, the court held a full-day preliminary injunction hearing, which included the presentation of live testimony. Shortly before the hearing, Sunrun notified Vivint and the court that Shaw no longer worked for Sunrun. Based on this new information, Vivint no longer seeks injunctive relief against Shaw.

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied;

7

(3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (citation omitted)).

## ANALYSIS

**I.   THE NON-SOLICITATION CLAUSE OF THE EMPLOYMENT AGREEMENTS**

Vivint seeks a preliminary injunction against Rossiter, Andersen, and Lords based on its claim that these defendants breached the non-solicitation clause of their Employment Agreements. Vivint argues that injunctive relief is required to prevent these defendants from continuing to breach this clause by actively recruiting its sales employees. Vivint has presented persuasive evidence that the defendants recruited Vivint sales representatives in contravention of their obligations under their Employment Agreements. Indeed, the court finds that Lords attempted to recruit a Vivint employee even after Vivint sued him.[5] Accordingly, the evidence presented at the preliminary injunction hearing establishes a strong likelihood of success on the merits on Vivint's claim for breach of the non-solicitation clause against the individual defendants. The court

---

[5] In a post-hearing brief, Vivint argued that phone records showed that Rossiter communicated with a Vivint salesperson multiple times before he left for Sunrun around April 21, 2024. But one of the exhibits it cites to support this assertion—PX079—contains no information, while the other—PX075—is indecipherable.

concludes, however, that Vivint is not entitled to a preliminary injunction because it has not shown that it would be irreparably harmed absent injunctive relief.

First, Vivint has not convinced the court that, absent an injunction, Rossiter, Andersen, and Lords will continue to recruit Vivint sales representatives. "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (citation omitted). The evidence shows that most of the individual defendants' recruiting efforts occurred around the time that they announced their departure for Sunrun in early January 2024, before Vivint sued them and moved for a preliminary injunction. Although Lords attempted to recruit a Vivint sales representative in March, after he had been sued, that was before he had been deposed and confronted by evidence that his efforts had been discovered by Vivint. Based on his demeanor during his testimony at the preliminary injunction hearing, the court finds that the prospect of money damages is likely sufficient to deter Lords from future recruiting attempts. Moreover, the evidence presented to the court demonstrates that Vivint and Sunrun recruit sales representatives during the winter and spring in order to conduct door-to-door sales during the summer season. There is no evidence that the individual defendants would have an incentive to recruit additional Vivint representatives in the middle of the summer sales season.

Second, Vivint has not shown that the harm caused by any future recruitment would be irreparable. "Demonstrating irreparable harm is 'not an easy burden to fulfill.'" *Id.* (citation omitted). In order to prove irreparable harm, "the movant 'must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" *First W. Cap. Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (citation omitted). "[W]hether money damages will constitute an adequate remedy requires consideration of the

difficulty of proving damages with any reasonable degree of certainty." *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990). In determining whether harm is irreparable, courts may consider factors such as "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004).

Vivint asserts that the principal harm caused by the individual defendants' recruiting efforts is the loss of valuable employees who would have otherwise stayed with Vivint and generated sales for the company. This harm is not irreparable. Vivint maintains sales statistics for its employees. And although it is not an exact science, Vivint's damages arising from the defendants' breaches are capable of being measured in the form of lost sales and the cost of hiring and training replacement sales representatives. Indeed, Vivint has submitted two declarations authored by its Senior Vice President, D. Evan Pack, which purport to measure the impact of the individual defendants' solicitation of its sales representatives. Pack's second declaration compares Vivint's sales numbers for the first quarter of 2024 with the first quarter of 2023 and attributes the decline to the defendants' solicitation of its sales force. Moreover, another Senior Vice President, Joshua Crittenden, provided an estimated cost for equipping and training sales associates for each sales season. Thus, Vivint's own evidence shows that it is possible to adequately measure any damages caused by the individual defendants' solicitation of its employees. *See DTC Energy*, 912 F.3d at 1272 (holding that a district court did not abuse its discretion when it ruled that the harm caused by an employee's solicitation of the plaintiff's customers was not irreparable because the plaintiff's own evidence showed that it was possible to measure the value of the diverted business); *Dominion Video*, 356 F.3d at 1261 (noting that the plaintiff did not dispute the district court's finding that the

defendant's expert witness "persuasively demonstrated that a loss in the marketplace . . . would be readily determinable if proper methodology were used").[6] In sum, Vivint has provided a preliminary roadmap for how it intends to prove damages for lost sales employees allegedly tied to the individual defendants' past recruiting efforts. If the defendants solicit Vivint's sales employees in the future, the same analysis can be applied.

Finally, Vivint argues that the court should defer to language in the Employment Agreements stating that the parties to the contracts acknowledged that any breach of the non-solicitation clause "will cause [Vivint] immediate and irreparable harm." But a contractual stipulation to irreparable harm alone "is insufficient to support an irreparable harm finding." *Dominion Video*, 356 F.3d at 1266. Indeed, it is the court's role to determine whether a plaintiff has satisfied the irreparable harm requirement when deciding whether to exercise its equitable power to issue injunctive relief. The parties to a contract may not usurp this function through a stipulated irreparable harm clause. *Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) ("[C]ontractual language declaring money damages inadequate in the event of a breach

---

[6] In support of its motion for a preliminary injunction, Vivint filed the declaration of a damages expert, Christoper Gerardi, who opined that the loss of Vivint's sales representatives constituted irreparable harm. Vivint paid Girardi $795 per hour plus expenses to prepare his declaration. The court does not find Girardi's opinions to be persuasive. Gerardi cites the same caselaw found in Vivint's briefing as the basis for his understanding regarding the legal standard for assessing irreparable harm. He also extensively relies on the same Vivint declarations supporting its motion for a preliminary injunction as the basis for his understanding of the predicted harms that Vivint would suffer. With little additional analysis, Girardi opines that those harms would be irreparable because they would be difficult to quantify. The court finds that Girardi essentially operated as a hired gun for Vivint by repackaging its litigation positions as expert opinions. The court does not find his opinions regarding irreparable harm to be persuasive and disregards them.

does not control the question whether preliminary injunctive relief is appropriate."). Accordingly, the court gives no weight to the irreparable harm clause found in the Employment Agreements.[7]

Because Vivint has not shown that it will be irreparably harmed in the absence of injunctive relief, the court denies its request for an injunction enforcing the non-solicitation clause of the Employment Agreements. *See Dominion Video*, 356 F.3d at 1260 ("[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." (citation omitted)).

## II. THE NON-COMPETE CLAUSE OF THE RSU AGREEMENTS

Vivint also requests a preliminary injunction against Rossiter, Andersen, and Lords based on its claim that they breached the non-compete clause of the RSU Agreements. The defendants oppose this request on two principal grounds. First, they contend that this court lacks jurisdiction to grant injunctive relief because the RSU Agreements require all disputes arising out of these contracts to be litigated in Delaware. Second, the defendants argue that Vivint has not satisfied the requirements for injunctive relief.

### A. Forum Selection Clause

The RSU Agreements contain a choice-of-law provision requiring that the contracts be construed in accordance with Delaware law. These contracts further provide: "if any suit or claim is instituted by the Participant [i.e., the individual defendants] or the Company [i.e., Vivint] relating

---

[7] This provision in the Employment Agreements further stipulates that any breach of the non-solicitation clause "will entitle [Vivint] to injunctive relief that prohibits [the employee] from continuing any such violation." The court need not address this broader stipulation because Vivint does not argue that it requires the court to grant its motion for injunctive relief.

to this Restricted Stock Unit Agreement, the Grant Notice or the Plan, the Participant hereby submits to the exclusive jurisdiction of and venue in the courts of Delaware." Based on this language, Rossiter, Andersen, and Lords argue that any litigation relating to the RSU Agreements must be brought in Delaware and that this court lacks jurisdiction to enter a preliminary injunction based on the obligations contained in these agreements.

The court disagrees. Under Delaware law, courts must "give effect to the plain-meaning of the contract's terms and provisions." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (citation omitted). The plain language of the forum selection clause specifies that only the "Participant"—i.e., the employee—must submit to the jurisdiction of the courts of Delaware. This clause does not require Vivint to bring an action in Delaware. At least one Delaware court confirms this reading of the forum selection clause. In *Plaze, Inc. v. Callas*, No. CV 2018-0721-TMR, 2019 WL 1028110, at *2 (Del. Ch. Feb. 28, 2019), the Court of Chancery of Delaware analyzed a similar forum selection clause, which provided that "[e]ach of the Parties submits to the jurisdiction of the State of Delaware and the Federal District Court for the District of Delaware in any action or proceeding arising out of or relating to this Agreement." The contract defined the term "Parties" to include some, but not all, of the parties to the contract. *Id.* at *1. In analyzing the language of the forum selection clause, the court found that a party to the contract that was not included within the definition of "Parties" was not bound by the forum selection clause. *Id.* at *4–*5. Similarly, the express terms of the RSU Agreement do not require Vivint to bring an action in Delaware.

The individual defendants contend that the use of the term "exclusive jurisdiction" in the forum selection clause at issue here requires all parties to the RSU Agreement to litigate in Delaware. But the language of the clause belies the defendants' argument. Under the RSU

13

Agreement, only the defendants are required to submit to the exclusive jurisdiction of Delaware courts. The defendants' proposed reading would do violence to the plain language of the contract.

### B. *Injunctive Relief Standard*

Having rejected the defendants' jurisdictional argument, the court now turns to the question of whether Vivint has shown that it is entitled to an injunction enforcing future compliance with the non-compete clause of the RSU Agreements. Vivint acknowledges that the court cannot force Rossiter, Andersen, and Lords to return to their old jobs. Instead, Vivint argues that the court should order them to stop performing any work for Sunrun until their 12-month non-compete period runs. In order to prove that it is entitled to such an injunction, Vivint must show that it will be irreparably harmed by these defendants' continued employment at Sunrun through the end of the non-compete period. The court concludes that Vivint has not satisfied this requirement.

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Moreover, "[i]n defining the contours of irreparable harm, case law indicates that the injury 'must be both certain and great, and that it must not be merely serious or substantial.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004) (citation omitted). Vivint has failed to show that any injury caused by the individual defendants' continued employment with Sunrun would be both likely to occur and great in magnitude. In its briefing, Vivint argues that the loss of the individual defendants' services, along with loss of the services of numerous other sales representatives that have moved to Sunrun, has adversely affected its bottom line. Vivint backed up these assertions with evidence of a decline in revenues caused by the resignations of its seasoned sales representatives. But other than a cursory reference in its reply brief to the individual defendants' continued employment at Sunrun damaging its goodwill, Vivint

14

has not explained in its briefing how the defendants' continued employment at Sunrun would irreparably harm it. Moreover, Vivint's damages expert focused on harms to Vivint caused by its loss of sales representatives. He did not express any opinion regarding any harm to Vivint caused by the defendants' employment with Sunrun through the end of their non-compete periods. Absent any substantial briefing or any evidence of harm, Vivint has not demonstrated that it will likely suffer a great injury in the absence of injunctive relief prohibiting the individual defendants from continuing to work for Sunrun. *See Baker's Aid v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (holding that the district court did not abuse its discretion by denying a preliminary injunction where the plaintiff failed "to produce any evidence of irreparable harm, other than the conclusory statement of its president"). Accordingly, Vivint has not proven that it is entitled to injunctive relief based on the non-compete clause of the RSU Agreements.

### III.   TORTIOUS INTERFERENCE

Vivint alleges that Sunrun tortiously interfered with its contractual relations with Rossiter, Andersen, and Lords by encouraging them to breach the restrictive covenants contained in their Employment Agreements and the RSU Agreements. Based on this claim, Vivint seeks to enjoin Sunrun from continuing to help the individual defendants to solicit its sales employees and from continuing to employ them during the term of their non-compete clause.

In order to prevail on its motion for an injunction against Sunrun, Vivint must show that it will be irreparably harmed in the absence of injunctive relief. In other words, it must demonstrate that it will be irreparably harmed by the individual defendants' future recruiting efforts and by their continued employment during the term of the non-compete clause. As discussed above, Vivint has not shown that it will likely be irreparably harmed in the absence of injunctive relief enforcing the non-solicitation and non-compete clauses. Accordingly, the court denies injunctive relief based on

its tortious interference claim for the same reasons that it denies injunctive relief on its contractual non-solicitation clause and non-compete clause claims.

### IV. THE NON-DISCLOSURE CLAUSE AND MISAPPROPRIATION CLAIMS

Vivint Alleges that Rossiter, Andersen, and Lords breached the non-disclosure clauses in their Employment Agreements and the RSU Agreements by disclosing and improperly using its confidential information. It further claims that these individual defendants and Sunrun are liable under Utah and federal law for misappropriating its trade secrets. Vivint seeks an injunction prohibiting the individual defendants and Sunrun from further disclosing or using its confidential and trade secret information.

The court denies Vivint's request for injunctive relief because it has not demonstrated a likelihood of success on its non-disclosure or trade secret misappropriation claims. In order to prevail on its contract claim against the individual defendants, Vivint must prove that they breached their obligations not to divulge or use for their own benefit "confidential information." To succeed on their federal or Utah misappropriation claims against all of the defendants, Vivint must show that they acquired, disclosed, or used its trade secrets without Vivint's permission. *See* 18 U.S.C. § 1839(5); UTAH CODE § 13-24-2(2). Vivint, however, has not shown that it will likely prove that the defendants improperly acquired, disclosed, or used any of its confidential or trade secret information.

Vivint first points to evidence that Andersen accessed Vivint's training videos about three months before he quit. But accessing training videos while he was employed as a manager of Vivint's sales representatives is not compelling evidence that he disclosed any confidential information or trade secrets contained in these videos or that he later used them for his own benefit or for the benefit of Sunrun. Next, Vivint produced evidence that at least eight unnamed sales

16

representatives accessed its customer information after these employees had agreed to join Sunrun. Vivint, however, has not produced evidence that the individual defendants in this lawsuit improperly accessed sales or customer information, nor has it pointed to evidence that Sunrun knowingly used any information that may have been taken by these unnamed employees.

Vivint also produced the affidavit of Joshua Crittenden, who declared: "I have heard multiple accounts of Sunrun appearing to have detailed knowledge of the compensation Vivint sales representatives receive, including compensation for sales leaders." Although courts may consider hearsay statements when evaluating a preliminary injunction motion, evidentiary concerns may affect the weight give such evidence. *Pharmanex, Inc. v. HPF*, 221 F.3d 1352 (10th Cir. 2000) (unpublished table decision) (citing 13 MOORE'S FEDERAL PRACTICE § 65.23). In substance, Crittenden's declaration states that unidentified Sunrun employees made unidentified statements to unidentified Vivint employees, who then reported their recollection or impression of these statements either to Crittenden or to unknown third parties before being relayed to Crittenden. Based on these unspecified reports, Crittenden offers his conclusion that Sunrun appeared to know how much Vivint pays its sales representatives. This single sentence in the Crittenden declaration is so amorphous as to constitute an unsubstantiated conclusion. The court gives little weight to this statement. Moreover, Rossiter, Andersen, Lords, and Shaw provided declarations in which they stated that Vivint had instructed them to brag about precisely how much they and other sales representatives make on social media and to potential hires as a recruiting tool. Based on evidence presented to the court about how Vivint manages its door-to-door sales operation, the court finds the individual defendants' statements to be credible, calling into question whether compensation information is either confidential or a trade secret.

Finally, Vivint presented credible testimony at the evidentiary hearing that a Sunrun executive instructed a group of Vivint sales representatives to retain Vivint's customer information so that they could use it to sell Sunrun's products when they moved to Sunrun. Although this testimony is certainly concerning, Vivint has not presented evidence that any of these sales representatives actually retained or used Vivint's information. Absent such proof, Vivint cannot prevail on its misappropriation claims against Sunrun.

## V. REQUEST FOR EXPEDITED DISCOVERY

Vivint argues that if the court does not grant injunctive relief, it should order the parties to engage in expedited discovery. Vivint's request is denied. The court has referred all matters related to discovery and scheduling to Magistrate Judge Pead. Indeed, Vivint filed a separate motion for expedited discovery, which Judge Pead denied. Judge Pead has also entered a scheduling order in this case with discovery deadlines. The court defers to Judge Pead's rulings.

## CONCLUSION

For the above-stated reasons, the court denies Vivint's motion for a preliminary injunction.

DATED July 16, 2024.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge